UNITED STATES of America,
Plaintiff-Appellee,

v.

Barbara HINTON et al.,
Defendants-Appellants.

Nos. 1018, 1019, 1023, 1062–1065, 1390,
Dockets 75–1402, 75–1418, 75–1441—
75–1445, 76–1024.

United States Court of Appeals,
Second Circuit.

Argued July 19, 1976.

Decided Sept. 27, 1976.

Certiorari Denied Nov. 29, 1976.
See 97 S.Ct. 493.

Certiorari Denied Jan. 17, 1977.
See 97 S.Ct. 796.

Joel A. Brenner, New York City (Gino E. Gallina, New York City, on the brief), for defendant-appellant Hinton.

Irving J. Bishop, Brooklyn, N.Y., for defendant-appellant Beckwith.

Lawrence K. Feitell, New York City, for defendant-appellant Cameron.

Joseph I. Stone, New York City, for defendant-appellant Carter.

Jeffrey C. Hoffman, New York City, for defendant-appellant John Darby.

Leslie A. Blau, New York City, for defendant-appellant Thelma Darby.

Harold I. Venokur, Brooklyn, N.Y., for defendant-appellant Bates.

Gary R. Sunden, New York City, for defendant-appellant McCargo.

David A. DePetris, Asst. U.S. Atty. (David G. Trager, U.S. Atty., E.D.N.Y., Paul B. Bergman and Alvin A. Schall, Asst. U.S. Attys., Brooklyn, N.Y., on the brief), for plaintiff-appellee.

Before WATERMAN, HAYS and MESKILL, Circuit Judges.

WATERMAN, Circuit Judge:

Following a ten week jury trial in the United States District Court for the Eastern District of New York, appellants Barbara Hinton, William Beckwith, James Carter, David Bates, Scarvey McCargo, Charles Cameron, John Darby, and Thelma Darby were convicted of conspiracy to violate the federal narcotics laws, 21 U.S.C. §§ 812, 841(a)(1), 846, 960(a)(1) and 963. Four of them, Hinton, Beckwith, John Darby, and Bates, were also convicted of using the telephone to further the conspiracy, 21 U.S.C. § 843(b). In support of their prayers for reversal, appellants raise a plethora of claims; but, save one raised by Barbara Hinton as set forth below, we find these claims to lack merit. Accordingly, we affirm all of the convictions except the conviction of Barbara Hinton.

## I. FACTS

Appellants, and ten other co-defendants, were charged in Count One of an indictment filed January 29, 1975, with conspiring between September, 1968, and January, 1975, to import into the United States, and to distribute and possess with intent to distribute, substantial quantities of heroin ·and cocaine. In Counts Two through Nine of the indictment, many, though not all, of the defendants were separately charged with using the telephone to further the conspiracy charged in Count One.[1]

Two defendants pleaded guilty prior to trial.[2] Three other defendants, including

1. Hinton was so charged in two counts, Beckwith in five counts, John Darby in five counts, Bates in two counts, Thelma Darby in one count, and Matthews in six counts.

2. Donald Conner and Walter Rosenbaum. Conner pleaded guilty to the conspiracy charge and was sentenced to ten years imprisonment, a special parole term of five years, and a $10,000 fine. Rosenbaum, who testified as a Government witness, pleaded guilty to a su-

Frank Matthews, the kingpin of the narcotics operation, were, and still are, fugitives.[3] Of the remaining thirteen defendants who proceeded to trial before Chief Judge Mishler, five were acquitted by the jury.[4] The eight convicted at trial, all of whom now appeal their convictions, were each sentenced to at least two years imprisonment;[5] and, except for John Darby and Carter, they have all been released pending appeal.

No elaborate recitation of the rather extensive facts need be given in order to construct a backdrop for the arguments appellants have raised. In essence, the Government's proof at trial established the existence of a large narcotics conspiracy operating from 1968 through 1975, with the not uncommon structure of receivers, distributors, couriers for sub-organizations, and suppliers of diluents used in the "cutting" of narcotics.

Frank Matthews, common-law husband of appellant Hinton, occupied a central position in the operation; and it was he who principally orchestrated the importation of drugs from connections abroad, largely from Venezuela. The drugs were then diluted and packaged at one of the organization's drug "mills," such as the apartment located at 925 Prospect Street, Brooklyn, nicknamed the "Ponderosa," and were thereafter distributed by organization lieutenants and other connections in Maryland, Pennsylvania, Ohio, New York, North Carolina, and other United States locations. McCargo, a Matthews lieutenant, worked principally at the "Ponderosa," cutting and bagging narcotics. Carter, an upper-level receiver of narcotics from the organization, acted as the major distributor in Maryland, utilizing a sub-cadre of couriers and connections in that state. For instance, in late 1970, there was a shortage of heroin in Maryland; and several of Carter's people met to discuss the problem. Purcel Wylie, a Carter courier, told one of Carter's customers, Norman Coleman, that Frank Matthews was Carter's connection and that to obtain a supply of narcotics he was to call a phone number in New York to contact Matthews' wife, Hinton, and that she would connect Wylie with one of the organization's lieutenants who would supply the heroin.

perseding information charging a violation of 21 U.S.C. § 843(b); and the court suspended the imposition of sentence, imposing a three year term of probation. The underlying conspiracy charge was dismissed.

3. Gattis Hinton and Fred Brown are the two others yet at large.

4. Robert Currington, Ernest Robinson, James E. Martinez, Lucy Matthews, and Marzella Steele Webb, named in the conspiracy count, were so acquitted.

5. The judgments of conviction, and the sentences imposed, were entered against the appellants as follows:

*Barbara Hinton* —convicted on conspiracy count and on one telephone count; acquitted on second telephone count. Sentenced to two years imprisonment and a three year special parole term on Count 1; to a concurrent two year term of imprisonment on the telephone count.

*William Beckwith* —convicted on conspiracy count and one telephone count. Sentenced to fifteen years imprisonment, a special ten year parole term, and a $25,000 fine on Count One; to a concurrent four year prison term on the telephone count.

*James W. Carter* —convicted on conspiracy count. Sentenced to fifteen years imprisonment and a five year special parole term.

*Scarvey McCargo* —convicted on conspiracy count. Sentenced to five years imprisonment and a five year special parole term.

*Charles W. Cameron* —convicted on conspiracy count. Sentenced to eight years imprisonment, a five year special parole term, and a $5,000 fine.

*John Darby* —convicted on conspiracy count and five telephone counts. Sentenced on Count One to fifteen years imprisonment, a five year special parole term, and a $25,000 fine; on Counts Four through Eight, to three years imprisonment, each consecutive to each other, but concurrent to Count One.

*Thelma Darby* —convicted on conspiracy count; acquitted on telephone count. Sentenced to five years imprisonment, a five year special parole term, and a $25,000 fine.

*David C. Bates* —convicted on conspiracy count and on one telephone count; acquitted of one telephone count. Sentenced to eight years imprisonment, a special parole term of five years, and a $5,000 fine on Count One; to a concurrent four year prison term on the telephone count.

John Darby, a key lieutenant in the organization, supervised the distribution of narcotics in Pennsylvania. After Darby was arrested in September, 1972, and later was sentenced on a state "gun" charge to imprisonment in New York, his wife, appellant Thelma Darby, assumed his functions in the organization. In 1974, in particular, she had frequent contact with Walter Rosenbaum, who supplied the organization with mannitol and quinine used in cutting narcotics. Bates and Cameron, major receivers of narcotics from the Matthews organization, distributed in Pennsylvania and North Carolina, respectively. Beckwith acted as one of Matthews' lieutenants, assisting in the acquisition of diluents through Rosenbaum and other contacts. There was also evidence that Beckwith owned one of the organization's "cutting mills," an apartment at 101 E. 56th Street, Brooklyn, from which, among other things, a 32-gallon drum and oar used to cut and mix heroin, sifters, spoons, and other "cutting" paraphernalia, cases of quinine, various quantities of heroin and cocaine, and approximately $148,000 in cash were seized on September 15, 1972, during a search incident to a valid warrant.

Investigation by federal and state narcotics agents of the Matthews organization commenced in 1971, apparently as a result of the observations of one Detective Kowalski of the New York City Police Department, who lived at 130 Clarkson Avenue, Brooklyn, a building in which Matthews and Hinton also maintained an apartment. In 1971 and 1972, Kowalski observed several of the appellants, including Hinton, John and Thelma Darby, McCargo, and Cameron, frequently entering and leaving the apartment; and, on occasion, he observed them carrying paper bags, attache cases, and suitcases. Kowalski's observations triggered surveillance by federal and state authorities of the comings and goings of Matthews and other organization members from other locations utilized by the organization, including 3333 Henry Hudson Parkway, Bronx. In 1972, surveillance was greatly increased; and in June and August of that year, two court-ordered wiretaps were obtained for the 3333 Henry Hudson Parkway apartment and for 7 Buttonwood Road, Toad Hill, Staten Island, a large residence built by Matthews and Hinton. A September, 1972, search of the 130 Clarkson Avenue apartment followed shortly thereafter; and various documents were turned up which concerned money received from narcotics purchasers and disclosed some of the expenditures made by the organization.

The arrest of various organization members in 1972 and 1973, such as that of Norman Coleman in March, 1972, and their agreements to cooperate with the Government, assisted federal and state authorities in pursuing the already extensive investigation underway. In January, 1973, Frank Matthews was arrested in Las Vegas, Nevada. His arrest, and the organization's efforts directed at meeting his $325,000 bail bond, reduced from an initial $5,000,000, threw the organization into temporary disarray. Following the posting of the bond, Matthews "jumped" bail; and he has since been at large. After Rosenbaum's arrest and agreement to cooperate with the Government in June, 1973, undercover agents began to infiltrate the organization, posing at times as prospective suppliers of the then scarce diluents quinine and mannitol. Organization narcotics sales nonetheless continued through early 1975.

## II. THE INDICTMENT OF BARBARA HINTON

Appellant Hinton raises seven points of error, one of which is of importance and is discussed forthwith. She claims that her indictment by the same grand jury which heard her give immunized testimony constitutes a violation of her Fifth Amendment rights and her right to due process, and that, accordingly, as to her, the indictment must be dismissed and her conviction after having been tried upon that indictment must be reversed.

The grand jury which returned the instant indictment was convened in June, 1972. On November 21, 1972, Hinton ap-

peared before that grand jury for the first time. After giving some 20 pages of testimony, during which she claimed her privilege against self-incrimination as to nearly all questions not pertaining to her "pedigree," she was excused. The Government subsequently sought an order granting Hinton immunity; and on February 16, 1973, the late Judge George Rosling of the U.S. District Court, Eastern District of New York, signed such an order. On February 20, 1973, Hinton was recalled to testify; but she persisted in claiming her privilege and was shortly thereafter excused, apparently to enable the prosecutor and her attorney to discuss the immunity issue. She was then recalled on both February 21 and March 7, 1973, during which appearances she gave approximately 200 pages of testimony. Two years later, this same grand jury, the grand jury which had heard her immunized testimony, indicted her; and she stood trial on the allegations contained in that indictment.

At trial, Hinton's counsel moved at least three times for a dismissal of the indictment, or, in the alternative, for a hearing on the issue of whether the indictment had been tainted by the improper use of her immunized testimony. Judge Mishler did not dismiss the indictment, and at first declined to grant the alternative request for a hearing; but he stated that he would examine the grand jury minutes to ascertain whether an independent source existed for the evidence upon which the indictment was founded. Later, upon a renewed motion, the court stated that "[i]f the defendant is convicted I will give you a full hearing." However, when counsel, after the Government had rested, again moved for a hearing, the judge, stating that he had decided against Hinton's petition, retracted his earlier commitment.[6]

Hinton contends that, as to her, the indictment was necessarily tainted by the grand jury's having heard her immunized testimony; and thus that she has suffered an unconstitutional deprivation of her privilege against self-incrimination. She further contends that, inasmuch as the Government was never required to show that it had an independent source for the evidence which formed the basis of her indictment, the trial court's refusal to conduct a hearing on the issue of taint constitutes reversible error. The Government counters that the evidence underlying Hinton's indictment was obtained or derived from an independent source because: (1) Hinton's testimony was entirely self-exculpatory; (2) she was indicted nearly two years after giving her immunized testimony; and (3) the evidence incriminating Hinton came primarily from one Donald James, who testified before the grand jury prior to Hinton, and also came from the wiretaps conducted in June through September, 1972.

At first glance, it would seem that where the indictment is returned by the same grand jury which heard the defendant's immunized testimony, it would be virtually impossible for the Government to show that it had an independent source for the indictment's evidentiary base as "[d]espite any instructions from the judge, it would be well nigh impossible for the grand jurors to put [the immunized witness's] answers out of their minds, *cf. Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476

---

**6.** Judge Mishler concluded that there was no need for a hearing as "there is no question in my mind that the Government used none of the testimony that she gave before the grand jury." There is no evidence in the record, however, that the Government was ever required to affirmatively establish that the indictment was based on evidence fully independent of Hinton's testimony.

Judge Mishler further concluded, in agreement with the Government's position, that the necessity for permitting the same grand jury to indict Hinton that had heard Hinton's immunized testimony was occasioned by the fact that the grand jury's term extended from 1972 to 1975 during which so many witnesses were heard in connection with this conspiracy that "it's very likely that some of the witnesses who appeared before the Grand Jury, some of them might be targets, and were also indicted by the Grand Jury. It seems like a needless process,

(1968) . . . ." *Goldberg v. United States,* 472 F.2d 513, 516 (2d Cir. 1973).[7]

Here, however, the issue is complicated by the Government's assertions, assertions emphasized by the trial court, that, in fact, Hinton gave no incriminating testimony before the grand jury, and that she did not admit any knowing involvement in the facts and circumstances later charged in the indictment against her. From this, the Government contends in its brief that Hinton's testimony was not necessary to form a factual predicate for her indictment. The Assistant United States Attorney did admit at oral argument, however, that it was not until after Hinton's own testimony that he realized the extent of her involvement. Further, the Government argues that Hinton's denial of any involvement in the narcotics operation the grand jury was studying left her in the same position as if she had claimed the Fifth Amendment privilege.

■ Analysis must begin with 18 U.S.C. § 6002, the immunity statute. It provides, in relevant part, that:

.[N]o testimony or other information compelled under the order [granting immunity] (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

The question here is whether any of Hinton's immunized testimony, or any information directly or indirectly derived from that testimony, was used against her in her prosecution. In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), in upholding the constitutionality of § 6002, the Court stated that once a defendant demonstrates that he has testified under immunity to matters relating to the federal prosecution, the prosecution has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." 406 U.S. at 460, 92 S.Ct. at 1665. As we have previously emphasized, the burden imposed by *Kastigar* requires not merely a showing by the Government that the immunized testimony was not the indictment's "legal cause"; rather, the prosecution must establish that the legitimate evidence upon which the indictment was founded was gleaned from a source "*wholly* independent of the compelled testimony." *United States v. Kurzer,* 534 F.2d 511, 516 (2d Cir. 1976).

■ The cases since *Kastigar* in which appellate courts were faced with the claim that evidence was improperly derived from immunized testimony, or that the immunized testimony was itself improperly used, are of little assistance in resolving the question here. None of them involved the situation where the same grand jury which heard a witness's testimony returned an indictment against that witness based upon

---

to just hear the entire testimony and hand it over to [a new] Grand Jury for indictment."

**7.** It has been suggested, however, that this dictum from Judge Friendly's opinion in *Goldberg* has been overruled by *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). *United States v. Dornau,* 491 F.2d 473, 481 n. 15 (2d Cir. 1974). This suggestion is based on the dictum in *Calandra, supra,* 414 U.S., at 345, 94 S.Ct., at 618, that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted . . . . on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination," citing *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). We agree with appellant Hinton that the *Dornau* suggestion is suspect, inasmuch as the *Goldberg* panel con-

sidered *Lawn* and concluded that that decision did not settle the question, 472 F.2d at 516 n. 4, a viewpoint which we share. *Lawn* involved two successive grand juries, the first of which heard defendants' testimony and received their records, and the second of which returned the indictment upon which they were tried. In direct contrast to the instant case, the defendants in *Lawn* "had no reason, beyond suspicion, to believe that the [second] grand jury considered any of the materials produced by petitioners before the [first] grand jury." 355 U.S., at 348–49, 78 S.Ct., at 317. Where the grand jury which hears the witness's testimony and the grand jury which indicts is the same grand jury, as here, consideration of the immunized testimony by that jury is a virtual certainty.

facts about which the witness testified.[8] It *is* clear from these subsequent cases, however, that the fact that none of Hinton's immunized testimony was introduced at the trial does not resolve the question, for § 6002 speaks to *any* use of the immunized testimony against the witness in any criminal case, and so prohibits its use not merely at trial, but in the grand jury proceedings as well. *United States v. Kurzer, supra; cf. Kirby v. Illinois,* 406 U.S. 682, 688–9, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

We cannot agree with the trial judge that the Government has satisfied its burden of demonstrating a "wholly independent" source for the evidence upon which Hinton's indictment was grounded. Even if Hinton in her testimony before the grand jury substantially denied any involvement in the conspiracy, that denial does not preclude the possibility of improper use against her of her testimony. A juror can draw an inference of a witness's guilt from either a confirmation of, or a denial of participation in, acts about which he is questioned. For instance, if witness X denies involvement in a situation in which one or several other witnesses have already confirmed X's participation, the jurors could reasonably draw an inference that X had not truthfully testified about the incident. Distrust of his testimony on that one point could reasonably lead the jurors to distrust all or a large part of X's testimony on other matters. If witness X had kept silent, or had been permitted to assert his Fifth Amendment privilege, those negative inferences would have been precluded.

We are thus unpersuaded by the Government's contention that the evidentiary basis for the indictment of Hinton was derived *in toto* from the testimony of Donald James and the wiretaps. While that evidence may have been incriminating, it is difficult, if not impossible, to determine, without questioning the grand jurors themselves, whether, standing alone, it would have justified the indictment of Hinton. The Government found it necessary to call Hinton under grant of immunity after James had testified, and this would tend to indicate his testimony was not sufficient to inculpate her, and the jurors needed to have her face them before deciding to indict.

The fact that Hinton was indicted some two years after she testified also fails to negate the existence of taint. As she notes, we have no information as to whether her testimony was later reread to, or summarized for, the grand jury, or whether any leads or other information were derived from her testimony that were later used by the Government in obtaining evidence to influence the grand jury's decision whether to indict her. This Government argument that the lapse of time cleanses taint borders on the frivolous: there was but one indictment, and it was returned against all of the defendants when the grand jury had completed its 31-months of studies. Likewise, the Government's final argument is also particularly unconvincing; to wit, that it would have been too costly and time-consuming to convene a new grand jury to indict Hinton inasmuch as the original grand jury had heard scores of witnesses during its 31-months term.

Thus we conclude that there has been no compliance with the *Kastigar* requirement that the Government must affirmatively prove that the evidence against Hinton was derived from a wholly independent source; but we are now faced with the equally important issue of whether a hearing to ascertain whether the immunized testimony was improperly used is a fit remedy to be applied here. We are convinced that such a

---

**8.** *United States v. Kurzer,* 534 F.2d 511 (2d Cir. 1976); *United States v. Bianco,* 534 F.2d 501, 510–11 (2d Cir. 1976); *United States v. DeDiego,* 167 U.S.App.D.C. 252, 511 F.2d 818 (1975); *United States v. First Western State Bank of Minot, North Dakota,* 491 F.2d 780 (8th Cir.), *cert. denied sub nom. Thompson v. United States,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974); *United States v. Catalano,* 491 F.2d 268, 272 (2d Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974); *United States v. McDaniel,* 449 F.2d 832 (8th Cir.), *on remand,* 352 F.Supp. 585 (D.N.D.1972), *aff'd,* 482 F.2d 305 (8th Cir. 1973). *See also United States v. Dornau,* 359 F.Supp. 684 (S.D.N.Y.1973), *rev'd on other grounds,* 491 F.2d 473 (2d Cir.), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974).

hearing on the question of taint would not suffice. Beyond the foreseeable difficulties of establishing at a hearing that the grand jurors, when they decided to indict, did not improperly use the immunized testimony or leads or evidence derived from it, for us to condone the practice of having the same grand jury that heard the immunized testimony indict the witness who so testified [9] is to invite action where the cure is worse than the malady. The prospect of peering into the grand jurors' minds, or of examining them individually, to ascertain whether Hinton's testimony was improperly used, is both impractical and unpalatable.[10] To so defile the secrecy of the grand jury process is to compound the problem the Government has created, rather than to alleviate it. The alternative of convening a grand jury distinct from that which heard the immunized testimony is not so onerous as to justify the jeopardizing of a defendant's Fifth Amendment rights. To hold otherwise is to permit intrusion into the long-approved common law secrecy of the grand jury process.

█ We believe that as a matter of fundamental fairness, a Government practice of using the same grand jury that heard the immunized testimony of a witness to indict him after he testifies, charging him with criminal participation in the matters being studied by the grand jury, cannot be countenanced. The procedure is so fraught with applicable constitutional problems and with the potential for abuse that in our supervisory power over the administration of criminal justice in the district courts of this circuit, cf. *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), we are compelled to conclude that the procedure the Government adopted here falls outside the bounds of permissible prosecutorial conduct. Accordingly, we reverse the conviction of appellant Hinton and instruct that the indictment be dismissed as to her.[11]

### III. THE WIRETAPS

Appellants John Darby, Cameron, Hinton, Bates, and Thelma Darby [12] argue that the trial court erred in denying a pre-trial motion to suppress evidence obtained pursuant to two state wiretap orders. The first order, dated June 27, 1972, and signed by Justice William Kapelman of the New York Supreme Court, Bronx County, authorized interception of the narcotics-related conversations of Matthews, Hinton, John Darby, Carter, and others, over the telephone bearing the number 212–884–2043, located in Matthews' apartment at 3333 Henry Hudson Parkway. The order was extended once and expired August 24, 1972. The second order, dated August 24, 1972, and signed by Justice Samuel Rabin of the New York State Appellate Division, Second Judicial Department, authorized the interception of Matthews' conversations over the telephone bearing the number 212–979–4022, located in his residence at 7 Buttonwood Lane, Staten Island. Both orders

---

9. Of course the right of any grand jury to consider (18 U.S.C. § 6002) "a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order [granting immunity]" is not involved in this appeal in any way.

10. The apparent necessity for examining the grand jurors themselves at a hearing to determine whether any of the immunized testimony was improperly used against the defendant does not pertain in those cases where the question is whether an illegitimate use was made by a subsequent, entirely separate grand jury or at the trial of the defendant. In those cases, exploration of the question of taint can be made through examination of the defendant, the witnesses for the prosecution, and the witnesses whose testimony incriminated the defendants, see, e. g., *United States v. Kurzer*, 534 F.2d at 515–518, and by review of the prosecution's evidence and of the grand jury transcript, see, e. g., *United States v. Bianco*, 534 F.2d at 509–11; *United States v. First Western State Bank of Minot, North Dakota*, 491 F.2d at 786–788.

11. Having thus reversed her conviction by upholding her second claim of error, we need not reach the six additional arguments advanced by Hinton in support of reversal.

12. The appellants have standing to challenge the validity of the wiretap order since they are persons whose conversations were intercepted or against whom the interception was directed. N.Y.Crim.P.L. §§ 710.20 and 710.10(5.) and N.Y.C.P.L.R. § 4506(2.). *See also* 18 U.S.C. §§ 2510(11) and 2518(10)(a).

contained provisions requiring minimization of interception of calls unrelated to the narcotics investigation.

◼ Appellants claim that the evidence derived from the wiretap surveillance should have been suppressed as: (1) the Government failed to show as a prerequisite for the interception orders that normal investigative techniques would not suffice to unearth the conspiracy; and (2) Government agents failed to minimize the interception of communications. As the wiretap orders were issued pursuant to New York law (N.Y.Crim.Proc.L. §§ 700.15(4) and 700.20(2)) and the surveillance was conducted pursuant to those state statutes, the validity of the orders must be determined under state law. The equivalent federal statutes (18 U.S.C. § 2510 *et seq.*) and relevant federal decisional law may, however, be considered where there is inadequate state case law on a particular point. *United States v. Manfredi*, 488 F.2d 588, 599 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *People v. Castania*, 73 Misc.2d 166, 340 N.Y.S.2d 829, 833–36 (Monroe County 1973).

◼ Section 700.15(4) provides that an eavesdropping warrant may issue only "[u]pon a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ." Section 700.20(2)(d) supplements the above provision by requiring that every application for a wiretap warrant must contain a full and complete statement of facts establishing that normal investigative procedures have been tried and have failed, or that they reasonably appear to be unlikely to succeed if tried, or to be too dangerous to utilize. We agree with Judge Mishler that the affidavits submitted to the state courts in support of the wiretap application adequately established that normal investigative techniques would be unavailing, and that they thus complied with the mandates of §§ 700.15(4) and 700.20(2).

Judge Mishler noted that the purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods. *Cf. People v. Holder*, 69 Misc.2d 863, 331 N.Y.S.2d 557 (Sup.Ct.Nassau County 1972). Here, the affidavits submitted to the state courts by Officer Garay and Detective Nannery indicated that a rather extensive investigation of Frank Matthews and a number of his cohorts was already underway; but, as appellants suggest was the situation, the case against the co-conspirators was far from "airtight." The affidavits further indicate, based on ongoing non-wiretap surveillance, that Matthews was very likely involved in an expansive narcotics operation, and that he was using the telephone to further this enterprise. Use of normal investigative techniques had become increasingly unsuccessful, the affiants stated, as Matthews had become more and more evasive and had been changing his phone numbers and his phone usage. Thus, even though state or federal officers may have garnered sufficient information without the use of wiretaps to support an indictment against Matthews, and possibly against a few others, there was every reason to believe that additional co-conspirators were involved who could not be successfully investigated without wiretapping. The order instituting wiretapping was thus not in error.

◼ With reference to appellants' claim that the agents conducting the wiretaps failed to minimize interception in accordance with statutory requirements and the specific language of the wiretap orders themselves, we also agree with Judge Mishler that appellants' arguments must fail.[13]

13. It should be noted that it is doubtful that any of the appellants, aside from Hinton, even has standing to challenge minimization; and

she may only have standing to challenge the wiretap at her residence on Staten Island. The Bronx apartment was apparently not used as a

Section 700.30, N.Y.Crim.P.L., requires in paragraph 7 that every eavesdropping warrant contain a provision that interception "shall be conducted in such a way as to minimize the interception of [non-pertinent] communications . . . ." In determining whether the agents have complied with this requirement, a requirement included in the wiretap orders, neither the New York courts nor the courts of the circuit have applied a precise, mechanical standard. We must look to whether the agents devised a reasonable means of limiting interception, and to whether they utilized those safeguards in good faith. *See People v. Holder, supra,* 331 N.Y.S.2d at 562; *United States v. Manfredi, supra,* at 600; *United States v. Tortorello,* 480 F.2d 764 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

■ The Government submitted to Judge Mishler affidavits of the agents who executed the wiretapping. The agents stated that, although all calls were monitored, as soon as a call was determined to be personal in nature, the recording equipment was deactivated, and only "spot checks" were thereafter made to insure that the conversation did not turn to the subject of narcotics. It has been previously held that the mere fact that every conversation is monitored does not of necessity render the surveillance violative of the minimization requirement, *see, e. g., United States v. Bynum,* 485 F.2d 490, 500 (2d Cir. 1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), *later reinstated,* 513 F.2d 533 (2d Cir. 1975), and cases cited therein. And this is not a case where every conversation coming into and emanating from the wiretapped residences was recorded and overheard in its entirety, as in *People v. Holder, supra,* 331 N.Y.S.2d at 570. The agents stated below in their affidavits that they utilized a maximum of five minutes to ascertain whether a conversation was pertinent to their investigation or was a distinctly personal one. While a five-min-

ute ascertainment period is somewhat long (*compare United States v. Bynum, supra*), it was pointed out by the agents that the identification of types of calls was particularly difficult because of the conspirators' frequent use of code language when talking about narcotics, and because many calls which seemed at the outset to involve purely personal matters later turned out to be narcotics related. Here, as in *Bynum* and *Manfredi,* there was no way to frame screening instructions so as to avoid the taping of some "innocent" conversations. The calls were carefully catalogued, and those catalogues are discussed in some depth by Judge Mishler. We share his view that while it may be fairly said that the agents did not strictly adhere to the minimization instructions, it appears that a good faith attempt was made to limit intrusion into private intimacies so as to preserve the privacy interests of those whose conversations were monitored. Judge Mishler thus properly refused to suppress the wiretap evidence.

## IV. OTHER ARGUMENTS

■ McCargo and Cameron contend that the trial court erred in admitting into evidence proof that they failed to file any federal income tax returns during the years 1968–1974. They argue first that the admission of the returns was based upon Rule 404(b), F.R. of Evid., which pertains to admission into evidence, for limited purposes, of proof of other crimes, and that evidence should have been excluded as its prejudicial effect outweighed its probative value.

It is quite apparent from the trial transcript, however, that the evidence of failure to file tax returns was not admitted under Rule 404(b); but the proof was offered and was admitted as a corollary to the Government's presentation of evidence regarding large expenditures made by Cameron and McCargo during several of the years in question; and the Government's purpose

residence by any of the appellants. *See, e. g., United States v. Poeta,* 455 F.2d 117, 122 (2d Cir.), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) (only those persons who

have a privacy interest in the residence in which the tapped phone is located have standing).

was to negate the existence of any legitimate source for the money they had expended. The court so charged the jury as to the evidentiary use of the returns and explained that the jurors could in their discretion infer from the appellants' failure to file returns that they had no bona fide source of income upon which they could have drawn to make their large purchases.

Cameron and McCargo argue, however, that evidence of their failure to file is not probative of the fact for which it was offered—to show the absence of any legitimate income source. In *United States v. Falley*, 489 F.2d 33, 38–39 (2d Cir. 1973), we sustained, as tending to show the lack of any legal source of income, the admissibility of tax returns on which the defendants had reported very low income. Appellants contend that *Falley* is inapposite, arguing that the failure to file any returns at all, in contrast to the reporting of low income, could be the result of any number of non-comparable factors, and thus admissibility in *Falley* does not preclude rejection here.

We are not persuaded by this argument. While proof of non-filing is concededly of less probative force than a tax return showing minimal income, there can be little doubt that it does tend to negate the existence of a legitimate source of income. It is hardly conclusive, but it is undeniably relevant. The determination of the weight which might properly be accorded it was for the jury's determination, and they were so instructed. Appellants were free to rebut this evidence with proof that they had sufficient prior net worth to fund the expenditures they had made, or that they obtained the necessary funds through non-reportable, non-taxable sources, but they apparently offered no such explanations. We agree with Judge Mishler that the probative value of the evidence outweighed any incidental prejudice, and we uphold the propriety of his ruling admitting the evidence.

Appellant Thelma Darby claims that she was irreparably prejudiced by the court's failure to grant her a severance.[14] This prejudice allegedly arose from the fact that she and her husband were tried together. She argues that she was prohibited from introducing evidence explaining that the reason she made frequent trips to New York in 1974–75 from her home in Philadelphia was to visit her husband who was then incarcerated in a New York state prison, and not for the reason suggested by the Government, that she traveled on narcotics business.

This claim is disingenuous. It is clear from the trial transcript that while the court instructed both the Government and several of the defense counsel to avoid elicitation of testimony regarding John Darby's incarceration, Judge Mishler explicitly told Thelma Darby's trial counsel that he was free to present evidence before the jury that Mrs. Darby journeyed to New York for the purpose of visiting her husband. Once given this green light, defense trial counsel inexplicably failed fully to pursue the opportunity, except to inquire of a co-defendant who had taken the stand on his own behalf whether the witness knew that Mrs. Darby was going to New York to see her husband. If there were failure here, not justified by trial strategy, that failure is hardly chargeable to the trial court. Absent any further specific allegations of prejudice, we are unable to conclude that it was error to deny a severance.

Appellant Beckwith raises two points of error, both of which lack substance. First, he claims that his prosecution was barred by the double jeopardy clause of the Fifth Amendment. His argument is based on his indictment in September, 1972, in the Eastern District of New York for possession with intent to distribute quantities of heroin and cocaine in violation of 21 U.S.C. § 841(a)(1), a charge upon which he was subsequently convicted following a jury tri-

---

**14.** There is some question as to whether a timely motion for severance was ever made by Mrs. Darby below. She contends that while such a motion may not have been formally made on her behalf, Judge Mishler considered her to have joined in the severance motions voiced by three of her co-defendants. The Government sharply disputes this contention, and the relevant portion of the transcript does not resolve the controversy.

al. He claims that the instant conspiracy prosecution arises from the same substantive violations involved in the earlier indictment.

While it is concededly true that the 1973 conviction arose out of an incident which was also part of the conspiracy for which Beckwith was indicted and upon which he was convicted below, his claim misconstrues the principle of double jeopardy. A conspiracy count may be charged along with substantive offenses in the same indictment, *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), or it may be charged separately, and the defendant tried separately. *United States v. Ortega-Alvarez*, 506 F.2d 455, 457 (2d Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975). So long as the elements of each offense are sufficiently distinct from those of the other offenses separately charged, multiple violations of the narcotics laws arising out of a single transaction may be tried in two or more separate trials. *Id.*

Here, the charge of Beckwith's involvement with numerous co-conspirators in a far-flung narcotics venture, and the proof of his active participation from 1969–1972 in a conspiracy to import heroin and cocaine and to distribute those drugs in various United States locations, is irrefragably distinct from his earlier conviction on a single charge of possession. *United States v. Ortega-Alvarez, supra*, at 457–58. His argument that he is entitled to relief on the ground of collateral estoppel is similarly misplaced for no issue was determined in his favor at his prior trial on the substantive offense. *See Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *Sealfon v. United States*, 332 U.S. 575, 578–79, 68 S.Ct. 237, 92 L.Ed. 180 (1948).

In Beckwith's second claim he argues that the evidence at trial clearly established the existence of multiple conspiracies rather than the single conspiracy charged in the indictment. This claim is frivolous. The sole substantiating point urged by Beckwith is the fact that Frank Matthews and another co-conspirator, Miguel Garcia, were separately charged in an indictment returned by the grand jury prior to the return of the indictment before us. This, he suggests, renders inescapable the conclusion that there was one conspiracy in operation from 1969–1972, and an entirely separate one from 1972–1975. However, the proof against Beckwith points to the contrary. The testimony of Cameron, Norman Coleman, Walter Rosenbaum, and others established that Beckwith worked with Matthews, John Darby, and other organization members on a continuing basis throughout 1969–1973. The consistency of personnel, method and type of operation throughout that period militates against a finding of discrete conspiracies and facilitates ready distinction of this case from *United States v. Bertolotti*, 529 F.2d 149 (2d Cir. 1975), where we found an improper consolidation of at least four separate and unrelated criminal ventures. There was no material variance here between the indictment and proof.

We are similarly unconvinced by appellant Bates's conclusory allegations, unsupported by any facts, of multiple conspiracies. The Government's proof established his continuous membership in the Matthews organization from 1972–1975, during which time he was chiefly involved in the distribution of drugs in Pennsylvania, both individually and in conjunction with the Darbys. Here, too, there is no evidence of prejudicial variance.

Relying on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), appellant Carter contends that tape recordings of conversations between him and Norman Coleman, a Government witness, were erroneously admitted into evidence at trial. In 1972, subsequent to his agreement to cooperate with the Government, Coleman was outfitted by federal agents with a Kel transmitter. On June 5 and August 22 of that year, he recorded on the Kel set two conversations he had with Carter. At the time the recordings were made, Carter was under in-

dictment on a Maryland state narcotics charge and was represented by counsel in that pending case. Carter contends that the tapes were obtained in violation of his rights under *Massiah* as the federal agents were aware of the Maryland prosecution.

Carter's claim is illfounded. His statements to Coleman on June 5 and August 22, 1972, were elicited and recorded in the course of an investigation wholly distinct from the indictment in Maryland. *Massiah* speaks only to the situation where in the absence of retained counsel, statements are deliberately elicited from a defendant in connection with a crime for which he has already been indicted. 377 U.S. at 206, 84 S.Ct. 1199. *See also United States v. Edwards*, 366 F.2d 853, 873 (2d Cir. 1966), *cert. denied sub nom. Jakob v. United States*, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967). The statements were properly admitted.

Carter next contends that irreparably prejudicial error was committed at trial when Special Agent Louis Candell of the Drug Enforcement Administration, testifying regarding one of the taped Carter-Coleman conversations, inadvertently mentioned that Carter had referred to his pending narcotics case in Maryland.[15] In response to Carter's immediate objection, Judge Mishler excused the jury. He denied Carter's motion for a mistrial, but inquired of his counsel whether he wished a corrective instruction to be given to the jury. Counsel declined the offer, stating that he feared that any further comment would merely accentuate the problem.

Undeniably, the reference to Carter's pending indictment in Maryland in the jury's presence constituted error. However, because of the overwhelming evidence of Carter's guilt and the nature and context of the comment, we are constrained to conclude that the error must be deemed harmless. It is important to note that agent Candell did not say that Carter had spoken of a conviction on a narcotics charge; the comment referred to a case *pending* against Carter. The outcome of that prosecution was not revealed to the jury. Further, the comment was not induced by the Government; it was inadvertent. Finally, the improper reference occurred on the tenth day of a ten-week-long trial during which the jury heard thousands of pages of testimony. The comment did not serve to deprive Carter of a fair trial. *See United States v. Stromberg*, 268 F.2d 256, 269 (2d Cir.), *cert. denied*, 361 U.S. 63, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959) (inadvertent reference to defendant's having served time in jail was "an isolated [incident] during the course of a long trial"; curative instruction given); *Hardy v. United States*, 119 U.S.App.D.C. 364, 343 F.2d 233, 234 (1964), *cert. denied*, 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965) (reference by government witness to defendant's having done "time in the penitentiary"; curative instruction declined).

Appellant Cameron argues that the admission into evidence at trial of statements made by him at the 77th Precinct stationhouse in Brooklyn, New York, on February 7, 1975, was error. He contends first that the statements were elicited and recorded in violation of his Fifth and Sixth Amendment rights as defined in *Massiah v. United States, supra*, and second, that the admission of the statements constituted a "gross abuse of discretion."

After the instant indictment was returned by the grand jury in January, 1975, but before it was unsealed in February of

---

**15.** The relevant portion of the transcript reads as follows:

"(Tape played.)

\*   \*   \*   \*   \*   \*

A [Candell] (Continuing) At this point Mr. Carter is talking to Mr. Coleman and he told him that he didn't have or forgot his money and he is asking Mr. Coleman to lend him some money and Mr. Coleman says he has about $100 on him and Mr. Carter asks Coleman for $20.

(Tape played.)

A [Candell] (Continuing) Mr. Coleman asked Mr. Carter, he said 'When are you going to be ready to do something' and as I said earlier, Mr. Carter didn't respond specifically to that question. He began to engage in a conversation about *a pending narcotics case that he had against him in the state of Maryland.* . . ."
[Emphasis added]

that year, Cameron was kidnapped by Black Muslims, apparently for reasons having to do with his narcotics activities. The story of his three days in captivity is a sordid tale of brutality and deprivation, the specifics of which we need not explore here. Suffice to say that he was released in the early morning hours of February 7 after the payment of a ransom and arrived in somewhat battered condition at a relative's home in Brooklyn shortly thereafter. Upon his arrival, he was met by eight New York City police officers and was persuaded to go with them to the 77th Precinct for a "debriefing" regarding his kidnapping. Present at the police station were not only the New York authorities who questioned him, but also two of the federal agents, Officer Garay and Special Agent Mulhearn, who had been investigating Cameron's narcotics activities for purposes of the federal indictment. Cameron was then questioned without an attorney present for some 4½ hours,[16] and the entire interview, unbeknownst to Cameron, was tape recorded. Certain self-inculpatory statements regarding his narcotics activity made by Cameron in the course of the interview were admitted into evidence at trial following Judge Mishler's conduct of a suppression hearing.

██ Turning to the first prong of Cameron's argument, his *Massiah* claim, we do not agree that the statements were obtained in violation of Cameron's Sixth Amendment rights. While the federal agents were present in the stationhouse at the time of Cameron's questioning, they merely listened to the interview over an intercom of sorts down the hall from the room in which the debriefing was conducted. They neither posed questions nor suggested lines of inquiry. Further, as Judge Mishler emphasized, while the New York police officers who questioned Cameron were aware of a federal investigation of appellant's narcotics activities, they were not told of Camer-

on's pending federal indictment. As we previously stated in *United States v. Garcia*, 377 F.2d 321, 324 (2d Cir.), *cert. denied*, 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967), *Massiah* does not "apply in a case in which the questioner was completely unaware of the existence of the indictment and was not seeking information about the crime the indictment charged had been committed." Here, Cameron was taken to the stationhouse for the avowed purpose of questioning him as a kidnapping victim, not as the suspect of a federal crime; and there is no indication that this was a ruse or a surreptitious effort by the federal agents to gather post-indictment evidence improperly. It would take some distortion of the facts to conclude, as Cameron would have us conclude, that this was a deliberate effort by the New York authorities to elicit incriminating statements concerning his involvement in the crime for which he had been indicted by the federal grand jury. *United States v. Garcia, supra.* Finally, the fact that the officers in the 77th Precinct had been telephoned at some point prior to Cameron's interview by an attorney representing Cameron in a separate pending criminal appeal did not, under *Massiah*, obligate the officers to notify that attorney prior to interviewing Cameron. *See United States v. Masullo*, 489 F.2d 217, 222–23 (2d Cir. 1973).

██ We are also unpersuaded by Cameron's claim that he was forced to accompany the officers to the 77th Precinct and to remain there against his will, and therefore that his statements were not voluntarily made. After hearing the officers' and Cameron's accounts of the interview at the suppression hearing, and after reviewing the transcript of the interview, Judge Mishler concluded that Cameron's statements at the stationhouse had been freely and voluntarily made. He found that Cameron, a college graduate with "extraordinary famil-

16. No *Miranda* warnings were given Cameron, and prior to trial he sought to suppress the statements on the additional ground that they had been elicited in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Judge Mishler ruled that *Miranda* was inapplicable here as Cameron was questioned as the victim of a crime, not as a suspect, and the interview was non-custodial. Cameron has apparently now abandoned this argument.

iarity with leading Supreme Court decisions," was fully aware of his right to refuse to be interviewed, and knew that the police had no lawful means to compel him to answer questions. We find no error in the trial court's well-supported conclusion that Cameron's statements and presence at the stationhouse were "matters of choice."

Cameron's assertion that it was an abuse of discretion for Judge Mishler to admit the stationhouse statements is insubstantial. This argument appears to be premised on the erroneous assumption that the statements were admitted as evidence of other crimes. The transcript demonstrates, however, that the statements were admitted as admissions relevant to proof of his membership in the narcotics conspiracy. And it can hardly be contested that statements such as "[y]ou might think I'm a bad guy because I deal in drugs, I, I've sold drugs," or "when you are in drugs, . . . I don't mean no street corner pusher—you got a network of so much information. . . ." were relevant to Cameron's knowledge of, and his intent and culpability with reference to, the crime charged. In the first statement heard by the jury, Cameron spoke of his former involvement in the "business" when "I had what I paid them in my closet. I had that kind of money in my closet. My wife could put her hand on it just like that." The jury could reasonably infer that the "business" of which he spoke was narcotics, and the statement was of particular relevance inasmuch as there had earlier been testimony at the trial that Matthews kept money used in the narcotics operation stacked in piles in a closet at 130 Clarkson Avenue. These, and additional statements regarding extortion practiced upon narcotics dealers in Philadelphia, the slaying of "one of Frank Matthews lieutenants," and Cameron's view that the drug business was "all over" because the "guys that are in it are stuck in it, but there ain't no new guys coming in," tended to show Cameron's familiarity with the Matthews operation and narcotics activity in general. We accordingly uphold the admissibility of the statements.

We have carefully considered the remaining two claims advanced by Bates, and John Darby's additional point, and we find them to be without merit.

Judgment of conviction reversed as to Hinton, with instructions that the indictment be dismissed as to her; judgment affirmed as to all other appellants.