**UNITED STATES of America**

v.

**Salvatore D'AQUILA, et al.**

**Crim. No. H–89–14(AHN).**

United States District Court, D. Connecticut.

Aug. 10, 1989.

Stanley A. Twardy, U.S. Atty., John H. Durham, Robert J. Devlin, Jr., U.S. Dept. of Justice, New Haven, Conn., for U.S.

Ira Grudberg, New Haven, Conn., for Salvatore D'Aquila.

Robert Casale, Branford, Conn., for John Moore.

Joseph Wicklow, New Haven, Conn., for Dominic Onofrio.

Timothy Pothin, New Haven, Conn., for Sebastian Pantano.

Thomas Dennis, Federal Public Defender, Hartford, Conn., for Emil Sapere.

Andrew B. Bowman, Brett Dignam, Westport, Conn., for Francis Gratta.

Frank Iannotti, New Haven, Conn., for Charles Cerretta.

Susan Peck, Hartford, Conn., for William Sbona.

Donald Cardwell, Hartford, Conn., for Christopher Stathas.

Cornelius Ivers, Meriden, Conn., for John Ranno.

Richard Cramer, Wethersfield, Conn., for Vincent Sapere.

Charles Hanken, Bridgeport, Conn., for George Piangenti.

John Donovan, Cromwell, Conn., for John Wiernasz.

## RULING ON DEFENDANTS' MOTIONS TO SUPPRESS

NEVAS, District Judge.

The instant indictment charges some or all of the thirteen defendants with operation of an illegal gambling business, 18 U.S.C. Section 1955, conspiracy to collect debts by extortionate means and the related substantive offense, 18 U.S.C. Section 894. Defendants have moved to suppress the evidence obtained by the government as a result of electronic surveillance authorized by state wiretap panels. Three defendants, Vincent Sapere, Charles Cerreta and John Wiernasz, have also moved to suppress tangible evidence seized from their homes pursuant to search warrants. On June 5, 1989, the court heard oral argument on the motions.[1] For the reasons set forth below, the defendants' motions are denied.

### Background

To place defendants' various challenges properly in context, it is necessary to recount some of the facts relating to the underlying investigation. The instant indictment is the product of a state-run wiretap investigation which began in mid-September, 1987. The focus of that investigation was a suspected narcotics operation being conducted out of a Middletown residence. In the course of that investigation, state agents intercepted wire communications relating to the possible commission of state gambling offenses.[2] Those interceptions consisted of telephone calls made from the tapped telephone to a home telephone listed to defendant Dominic Onofrio.

A member of the Statewide Organized Crime Investigative Task Force ("SO-CITF"), Detective Edwin Grohe, began to investigate the gambling activity revealed

---

1. Of the defendants asserting motions to suppress tangible evidence, only defendant Sapere sought oral argument. The court heard argument of that motion on April 24, 1989. The other two movants have consented to having their motions decided on the papers.

2. These communications were intercepted pursuant to wiretap Order No. 87–12 and its extension, Order No. 87–12–1. For ease of reference, these wiretaps are referred to in this ruling as the "narcotics wiretaps."

by the intercepted calls. He determined that the receiver of the overheard gambling-related calls was Onofrio. He subsequently obtained "reliable source information" from an FBI criminal background check that Onofrio was connected by family and professionally to illegal gambling activity and was believed to be currently operating an illegal gambling business with convicted bookmaker, defendant Salvatore "Butch" D'Aquila. Detective Grohe attempted through various means to gather further information on the nature and extent of the gambling business being run by Onofrio.

On October 8, 1987, the State of Connecticut applied to a state wiretap panel for an order authorizing the wiretapping of the telephone listed to Onofrio at his residence in Middletown, Connecticut. The application stated that the intended benefit of the eavesdropping request was

> [t]o uncover the complete scope of this illegal gambling operation, including the telephone numbers and locations of other sports wagering 'offices' and 'layoff offices' and to identify persons operating same and to identify other unknown persons involved and to obtain evidence of illegal gambling against them.

Government's Exhibit ("Gov't Exh.") A, Application No. 87–16, para. 7(d). In support of the application, the state submitted an affidavit by Detective Grohe, setting out the progress of his investigation and the basis for the wiretap request.

On October 14, 1987, the state wiretap panel, comprised of three Superior Court Judges, issued a wiretap order (No. 87–15). The order authorized the interception over the target telephone of the oral communications of Onofrio, Phillip Lombardo and "other unknown persons." *Id.*, Order No. 87–15, para. D. In issuing the wiretap order, the panel found that there was probable cause to believe that Onofrio, Lombardo "and others unknown" had committed or were committing state gambling offenses.[3] *Id.*, para. B(1). In addition, the

panel determined that "other normal investigative procedures with respect to the [gambling] offenses have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ." *Id.*, para. B(4). The order expressly provided that it be executed "in such a way as to minimize the interception of communications not otherwise subject to interception." *Id.*, para. J. It further provided that the interception "shall terminate upon attainment of the authorized objective ... or in any event within 15 days" after the order was issued. *Id.*

During the execution of this wiretap, the state investigators intercepted calls linking Onofrio's apparent gambling business to individuals who had not been named in the wiretap order. Those interceptions led the state to apply for three successive wiretaps (Application Nos. 87–18, 87–20, and 87–23) during November and December, 1988. The state wiretap panel issued the wiretap orders (Orders Nos. 87–17, 87–19, and 87–22) on nearly identical terms and conditions as contained in No. 87–15. The only significant differences in these orders were as to the individuals and telephone facilities to be targeted. The other individuals named in these orders were defendants William Sbona, Sebastian Pantano, Francis Gratta, and Charles Cerreta. Wiretap Orders No. N–87–19 and No. 87–22 authorized the telephone wiretaps at residences located in South Meriden and Meriden, Connecticut, respectively.

Many of the communications intercepted on the gambling wiretaps related to federal offenses, such as 18 U.S.C. Section 1955 (operation of an illegal gambling business) and 18 U.S.C. Section 894 (extortion), which were not specified in the wiretap orders. The state turned over this evidence to the federal government for prosecution of those offenses. In March, 1988, United States Department of Justice Attorney John Durham sought and obtained judicial approval pursuant to 18 U.S.C. Section

---

**3.** These offenses were (1) Professional Gambling, and (2) Using a Telephone to Transmit and Receive Gambling Information, proscribed by Conn.Gen.Stat. Sections 53–278b(b) and 53–278d(a), respectively.

2517(5) for use of the interceptions as evidence of these offenses. Attorney Durham subsequently presented the wiretap evidence to a federal grand jury and obtained an indictment on January 21, 1989.

## Discussion

The defendants [4] seek to have suppressed the wiretap evidence and its fruits on several grounds. They challenge the gambling wiretaps with respect to the following: (i) the necessity for government eavesdropping; (ii) the validity of the wiretap panel's findings of necessity; (iii) the probable cause for the issuance of the wiretap orders; (iv) the constitutionality of the wiretap orders as applied; (v) the use of interceptions relating to offenses other than those specified in the wiretap orders; (vi) the execution of the wiretap orders; and (vii) post-wiretap notice to the defendants. Defendant Onofrio has also independently challenged the narcotics wiretaps on many of the same grounds.[5] In addition, defendants Vincent Sapere, Charles Cerreta, and John Wiernasz seek the suppression of evidence seized from their homes pursuant to state-issued search warrants. Each of these challenges will be addressed in turn with additional facts introduced as needed.

### I. The Wiretap Motions

■ Before turning to the merits of defendants' claims, it is appropriate to take note of the application of both federal and state law to the issues raised by the instant motions. Since the evidentiary use of wiretap evidence is in question, the mandates of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. Section 2510 et seq. ("Title III"), generally apply. See 18 U.S.C. Section 2515. However, by obtaining state authorization for the wiretaps, the government has also subjected itself to the requirements of state law, provided that those requirements are more stringent than those required by Title III and the federal constitution. *United States v. Manfredi*, 488 F.2d 588, 598 n. 7 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). In particular, those issues relating to individual privacy are to be resolved first by reference to state law, where its requirements are more stringent. *United States v. Lilla*, 699 F.2d 99, 102 n. 3 (2d Cir.1983) (citing *United States v. Sotomayor*, 592 F.2d 1219, 1225 (2d Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979)). *See also United States v. Marion*, 535 F.2d 697, 702 (2d Cir.1976).

### A. Necessity of Electronic Surveillance

Both federal and state law require the government to provide a "full and complete statement" why normal investigative procedures were not sufficient. *See* 18 U.S.C. Section 2518(1)(c); Conn.Gen.Stat. Section 54–41c(6). Under Title III, such a statement must discuss "whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. Section 2518(1)(c). *See also* Conn.Gen.Stat. Section 54–41c(6). This is required "to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).

■ In demonstrating the necessity of eavesdropping, the government need not

---

**4.** Defendants Sebastian Pantano, Francis Gratta and William Sbona have filed the principal memoranda of law in support of the motions to suppress the electronic surveillance evidence. All of the defendants, however, at one time or another have successfully moved to adopt the motions and arguments of the co-defendants who have submitted memoranda. The arguments attributed to the defendants in this ruling include those contained in these memoranda as well as those raised by various defense counsel at the hearing on June 5, 1989.

**5.** These claims were not raised at oral argument but were asserted in a memorandum of law filed on July 14, 1989. The government's reply brief was filed on July 28, 1989. Disposition of these claims is included in this ruling. Defendant Onofrio is the only defendant with standing to attack the validity of the narcotics wiretaps since he alone among the defendants was overheard in conversations over the tapped wire.

prove that "every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Fury,* 554 F.2d 522, 530 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977) (quoting *United States v. Pacheco,* 489 F.2d 554, 565 (5th Cir.), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1974)). The showing is to "be tested in a practical and commonsense fashion." S.Rep. No. 1097, 90th Cong., 2d Sess. 101, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2190. Traditional investigative techniques "need not be exhausted first if they are 'impractical' or costly and inconvenient. . . ." *Lilla,* 699 F.2d at 102. What is required are "specific, detailed reasons" why procedures other than wiretapping have not succeeded or would not succeed in obtaining the investigatory objective. *United States v. Ruggiero,* 726 F.2d 913, 924 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).

1. The Gambling Wiretaps

 a. *Supporting Affidavits*

■ In support of the gambling wiretap applications, the government submitted the affidavits of Detective Grohe. These affidavits explain in detail the techniques used in the investigation. They also discuss why certain normal investigative techniques were not tried. The defendants challenge the sufficiency of the affidavits in demonstrating the necessity of electronic surveillance. They contend that the government did not attempt to gather evidence by methods other than wiretapping but instead relied upon one wiretap to justify another. They argue that other than eavesdropping, the investigative methods tried were "ministerial" or "clerical" in nature and thus did not constitute "normal investigatory techniques." They further argue that several "normal investigatory techniques" could reasonably have been used or, at least, tried by the government.

Under the established standards used in determining necessity, the defendants' ar-

guments have some foundation but are ultimately unpersuasive. Undeniably, the supporting affidavits reflect less than extensive resort to "normal investigative techniques." They indicate that the police conducted limited physical surveillance, criminal background checks, utility checks and pen register analysis prior to applying for each gambling wiretap. More significantly, however, they provide considerable explanation why other "normal investigative techniques" were unavailing to the investigation.

According to the affiant, the investigation could not achieve its purpose without resort to wiretapping. That purpose, referred to in both the affidavits and wiretap applications, was not only to gather evidence on the targets of the investigation but, more importantly, to uncover the full scope of what was believed to be a large-scale gambling operation. The specific reasons given in discounting other investigatory methods to accomplish such a purpose were the following: continued visual surveillance—in addition to posing a risk of detection—would not be effective in revealing the scope or structure of the illegal operation, *see* Gov't Exhs. A, B, C, and D, Grohe Affidavit, para. 11(b); search or arrest warrants would be premature and of doubtful utility, *see id.* para. 11(a); there were no witnesses or undercover agents in a position to successfully penetrate the operation, *see id.* at paras. 11(a), (d); and the police lacked an informant. *See id.* at para. 11(c).

One line of attack upon the claimed necessity of eavesdropping is directed at the failure to explain why the police were unable to develop an informant who could penetrate the alleged operation and reveal its full scope. The affidavits were silent on this point. At oral argument, the government explained that, due to its inadvertent interception of gambling-related calls on the narcotics wiretaps, the investigators were subject to the state's "20–day rule," [6]

---

**6.** This rule, contained in the Connecticut wiretap statute, requires that the wiretap applicant not rely on any facts and circumstances that are more than twenty days old (i.e., more than twenty days next preceding the date of the application). Conn.Gen.Stat. Section 54–41c(7). *See United States v. Sanchez,* 676 F.Supp. 448, 451 (D.Conn.1987).

which deprived them of the time needed to cultivate a suitable informant.

Whether or not the effect of the 20–day rule is considered,[7] the fact that the state police "stumbled across" evidence of the illegal activity is highly significant. It would have been unusual, even remarkable, for the state to have had a ready or even potential informant at its disposal or to devise other methods on such short notice to enable the state to penetrate a criminal operation whose existence was discovered inadvertently in the course of a separate, unrelated investigation. To delay the investigation until an informant could be developed could have caused a significant delay in pursuing the investigation. Such a delay would have posed the very real risk of allowing the partially exposed gambling operation to slip back into hiding from where it had apparently been able to elude detection for some time. While the purpose of the investigation may have been well served by the use of an informant, the instant investigation did not have to come to a halt in the absence of one. There is no requirement "that any particular investigative procedures be exhausted before a wiretap may be authorized." *Lilla*, 699 F.2d at 104. *Accord United States v. Young*, 822 F.2d 1234, 1237 (2d Cir.1987). The defendants' insistence to the contrary, if given effect, would place upon wiretap applicants a burden of establishing *strict* necessity for the eavesdropping request. The caselaw does not support such a view. For example, in *Young*, the second circuit refused to suppress wiretap evidence for an inadequate showing of necessity where the police had no informant, and other conventional methods, such as visual surveillance, pen register analysis and examination of toll records, were found to be similarly unavailing. 822 F.2d at 1237.

This court finds *Young*—and not *Lilla*, as defendants contend—to be the precedent most applicable to the instant case. In

*Lilla*, the government had an informant who enabled the investigating officer to make an undercover buy from the target of the investigation. 699 F.2d at 100–01. Despite the apparent success of this method and the "small-time" nature of the narcotics operation, *id.* at 104, the government applied for a wiretap warrant. With these facts clearly in mind, the second circuit found that "[t]he affidavit supporting the application for the wiretap does nothing to allay our fears that the State in this case relied on wiretapping as a substitute for standard investigating procedures." *Id.* at 105.

In the instant case, the government had no available means of accessing the target operation. The numerous gambling-related calls overheard on the narcotics wiretap, and the FBI "source information" on Dominic Onofrio, gave the police reason to believe that he was involved in an expansive gambling operation and that he was using the telephone to further this enterprise. *See U.S. v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). While the interceptions on the narcotics wiretap clearly implicated Onofrio, it was very likely that additional persons were involved who could not be successfully investigated without wiretapping. *See id. See also*, Carr, *The Law of Electronic Surveillance* (2d ed. 1987) ("Carr"), Section 4.4(d)(2) at 4–67 (Though enough evidence has been obtained to indict a defendant, wiretap may still be authorized if "the trail does not end with that person."). Furthermore, the virtual certainty that this criminal business depended upon routine use of the telephone made eavesdropping a "particularly appropriate" method for the investigation, *see Young*, 822 F.2d at 1237 (citing *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976)), as contrasted to certain levels of narcotics deal-

---

**7.** This was a point of contention between the parties. Counsel for defendant Emil Sapere argued at the June 5 hearing that the government cannot rely on this rule, which is designed for the defendant's protection, to avoid its obligation of having to demonstrate necessity.

Government counsel countered that the state investigators were bound by both sets of requirements and the court was entitled to consider the impact of this conflict on the particular needs of the investigation.

ing where face to face sales are commonplace and informants and undercover agents are often used to make purchases.

Taking a "practical and commonsense view" of the particular needs of the investigation, and mindful of the pitfalls of "Monday morning quarterbacking," *see United States v. Shipp*, 578 F.Supp. 980, 989 (S.D. N.Y.1984), *aff'd sub nom. United States v. Wilkinson*, 754 F.2d 1427 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985), the court finds that the government sufficiently demonstrated the necessity of electronic surveillance.

### b. *Panel's Findings*

■The defendants launch a facial attack upon the findings of the wiretap panel that the state had established the necessity for eavesdropping. In essence, they contend that the panel failed to make an independent determination, required under federal and state law, that the government's showing had satisfied the necessity requirement. They point to the boilerplate and disjunctive form in which the panel's findings are stated. Such characteristics, they contend, show that the panel merely paid "lip service" to the statutory requirements that it make findings of necessity.

This formalistic argument is rejected. First, it overlooks the obvious fact that the boilerplate language used by the panel tracks the applicable state statute. *See* Conn.Gen.Stat. Section 54–41d(4). That fact alone makes the findings adequate, "though they are neither individualized as to the particular case nor consistent." Carr, Section 4.6(b) at 4–92 (citing *State v. Chiarizio*, 8 Conn.App. 673, 514 A.2d 370, 377 (1986)). Both section 54–41d(4) and its federal counterpart, 18 U.S.C. Section 2518(3)(c), demand the exercise of independent judgment; they do not require a separate "full and complete statement" from the issuing authority. Requiring the panel to issue particularized findings would impose a needless and cumbersome task upon an already overburdened state judiciary.

■ Second, the scrutiny suggested by defendants [8] flies in the face of the deference generally accorded to judicial findings under section 54–41d(4) and section 2518(3)(c). *See State v. Ralston,* 7 Conn. App. 660, 671, 510 A.2d 1346, 1352 (1986); *Ruggiero*, 726 F.2d at 924; *Sanchez*, 676 F.Supp. at 454. Deference should be given to the instant panel's findings in light of the considerable judicial experience its members have acquired in reviewing wiretap applications while serving on the state wiretap panel.

### 2. The Narcotics Wiretaps

■ Defendant Onofrio has challenged for lack of necessity the narcotics wiretap operation. The twin grounds of this challenge are that the affidavit offered in support of the eavesdropping request actually showed that the state had been successful through conventional methods in gathering evidence against the targets of the investigation, and that the affidavit failed to show that continued use of such methods would not bring further success. The government counters that the affidavit submitted to the wiretap panel did adequately describe the techniques used and why they would ultimately not succeed in attaining the objective of the investigation.

The affidavit does reveal successes in the use of conventional techniques. *See generally* Memorandum in Support of Dominic Onofrio's Motion to Suppress Wiretap Applications 87–13 and 87–13–1A and Wiretap Orders 87–12 and 87–12–1 and Evidence Derived Therefrom ("Onofrio Brief"), Exh. A, Schaeffer Affidavit ("Shaeffer Affidavit"), para. 8. Some ten months before the wiretap authorization was sought, local police officers observed an illegal narcotics transaction involving one of the target individuals, Phillip Lombardo. *Id.*, para. 8(F). This led to the confiscation of the cocaine exchanged, a confession by Lombardo and

---

8. At oral argument, counsel for defendant Christopher Stathas raised the possibility of filing a supplemental memorandum "to flesh out" the facts relating to the deliberative process used by the panel in making its findings. This sugges-

tion was ultimately abandoned when co-counsel indicated their preference for confining the court's inquiry to the four corners of the wiretap applications and orders.

his pledge to cooperate with the authorities *Id.* Lombardo ultimately reneged on the promise to cooperate, but he did provide the police with information implicating himself and others in a drug-trafficking operation being run out of the residence of a Thomas Cardella. Sometime later a member of the Statewide Narcotics Task Force, acting in an undercover capacity, was able to make two separate narcotics purchases from another suspected member of the drug ring, Rosario Aresco. *Id.*, paras. 8(K), (N). At another point in the investigation, the affiant with the help of an informant arranged a "controlled buy" of cocaine from Phillip Lombardo at the Cardella residence. *Id.*, para. 8(S). In addition, the affiant had received informant information from various sources implicating Thomas Cardella in the same drug-trafficking operation. *Id.*, paras. 8(J), (S).

The affidavit also describes why, in the affiant's experienced judgment, continuation of the conventional methods that had achieved initial success would fail to achieve the ultimate objective of the investigation. Due to the belief that targets Phillip Lombardo, Rosario Aresco, Thomas Cardella "and others presently unknown, in fact, have an extensive drug distribution system and have the capabilities to supply large quantities of narcotics to customers," *id.* para. 10, that objective went beyond simply gathering evidence of the drug offenses of which the state had become aware but also included the discovery of the sources of supply, distribution network and main "stash" locations used by those involved in the drug-trafficking operation. *Id.*

The affidavit satisfactorily explains the inability of conventional methods to carry out this investigatory objective. Continued physical surveillance of the Cardella residence ran the risk of discovery by the targets, particularly since the police had information that "look-outs" were being used. *Id.*, para. 11(B)(1)–(3). A search and seizure warrant for the Cardella residence

was unlikely to result in the discovery of any sizeable quantities of narcotics since, according to one confidential informant, the drug supply was not stored there. *Id.*, para. 11(A). The informant who made the "controlled buy" from Phillip Lombardo was in contact with some of the targets but lacked knowledge as to their sources of supply. *Id.*, para. 11(B)(4)(a). Furthermore, that informant indicated that he would be unwilling to testify against any of the individuals involved. *Id.*, para. 11(B)(4)(b). Infiltration by undercover police agents was shown to be similarly unavailing because source information had revealed that customers of this drug-dealing operation were usually required to sample the narcotics before making a purchase. *Id.*, para. 11(B)(4)(c).

In light of the stated purpose of the investigation, the state clearly established the inadequacy of the alternatives to wiretapping. Contrary to defendant Onofrio's contention, the instant facts are completely unlike those presented in *Lilla.* A more apt analogy may be found in *United States v. Puglisi*, 790 F.2d 240 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). In that case, the second circuit found wiretap authorization to be properly issued where the supporting affidavit demonstrated that visual surveillance had been unsuccessful, that confidential informants were unable adequately to penetrate the conspiracy and were in any event unwilling to testify and that an undercover officer would be unable to infiltrate the conspiracy because of the close-knit nature of the group and its strong ethnic ties. 790 F.2d at 241–42. The instant affidavit makes a comparably satisfactory showing.

### B. *Probable Cause*

Prior to issuance of a wiretap order, a state wiretap panel must make, on the facts contained in the wiretap application, nine separate determinations of probable cause. Conn.Gen.Stat. Section 54–41d.[9]

**9.** Under Section 54–41d a wiretap panel must find probable cause to believe that:

(1) An individual has committed or is committing an offense enumerated in section 54–41b; (2) particular communications will constitute material evidence that an offense enumerated in section 54–41b has been committed or is being committed or will materially

The wiretap application, namely the accompanying affidavit, must contain the information set out in Conn.Gen.Stat. Section 54–41c. Subsection 12 of this provision subjects those contents to the *Aguilar–Spinelli* test for probable cause.[10] *See Sanchez*, 676 F.Supp. at 450 (subsection is "essentially a codification of the '*Aguilar–Spinelli*' test") (citing *Ross*, 194 Conn. at 463, 481 A.2d 730). *Accord State v. Kimbro*, 197 Conn. 219, 496 A.2d 498 (1985). Accordingly, the affidavit must disclose "(1) some of the underlying circumstances relied on by the person providing the information to the affiant; and (2) some of the underlying circumstances from which the affiant concluded (a) that the informant, whose identity need not even be disclosed, was credible, or (b) that his information was reliable." *State v. Bember*, 183 Conn. 394, 410–11, 439 A.2d 387, 395 (1981) (citation omitted). *Accord Ross*, 194 Conn. at 463 n. 14, 481 A.2d at 738 n. 14.

Defendants raise only one challenge to the probable cause findings of the wiretap panel which is deserving of discussion. They argue that the government had no basis for alleging, especially prior to authorization of the first gambling wiretap, that it was investigating a gambling "opera-

tion"—consisting of "other sports wagering 'offices' and 'layoff offices' and ... operat[ors]" than had been revealed by the narcotics wiretap interceptions. *See* Gov't Exh. A, Application No. 87–16, para. 7(d). Before filing its first wiretap application, the state had evidence merely of alleged bookmaking activity between Onofrio and Lombardo. That evidence contained no mention of other participants or offices in the "operation." Defendants argue that the state was required to establish probable cause as to the existence of an "operation,"[11] and that it failed to do so in its applications for the gambling wiretaps.

■ A preliminary question raised by defendants' argument is whether a showing of probable cause is required with respect to the scope of the criminal activity under investigation. The first place to look in addressing this question is the applicable statutes. Title III requires four elements in the government's showing of probable cause: the offense being investigated, facilities or place from which interception is to occur, type of communications to be intercepted, and identity of persons to be overheard. 18 U.S.C. Section 2518(1)(b)(i)–(iv). The Connecticut wiretap statute requires nine probable cause determinations,

aid in the apprehension of the perpetrator of such offense; (3) such communications are not otherwise privileged; (4) other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ; (5) the facilities from which, or the place where, the wire communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such individual; (6) such facilities or places are not those described in section 54–41h; (7) if the facilities from which a wire communication is to be intercepted are public, a special need exists to intercept wire communications over such facilities; (8) the investigative officers to be authorized to intercept the wire communication are qualified by training and experience to execute the interception sought; (9) not more than thirty-four orders authorizing interception have been previously issued by all panels in the calendar year in which the application is made, except that upon a showing of an emergency situation in which the commission of an offense enumerated in section 54–

41b may result in imminent peril to public health, safety or welfare, such panel may issue additional orders authorizing interception.

10. Given the incorporation of the *Aguilar–Spinelli* test into the state wiretap statute, the less restrictive totality of the circumstances test of *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 *reh'g denied*, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983), is inapplicable. *State v. Ross*, 194 Conn. 447, 463, 481 A.2d 730 (1984). *See Lilla*, 699 F.2d at n. 3 (more stringent state requirements apply where designed to protect privacy).

11. Common usage of the word "operation," even in the criminal context, does not necessarily bring to mind questions of scope. For example, many criminal endeavors are, in fact, "one-man operations." However, defendants' argument contemplates and the wiretap applications and supporting affidavits suggest that the word "operation" in this case means something more than an individually-run criminal enterprise. For purposes of clarification and convenience, this ruling uses the word in quotes to reflect this particular meaning.

covering the elements required by Title III and others. Conn.Gen.Stat. Sections 54–41d. While both statutes require a probable cause finding as to the commission of those offenses for which eavesdropping is to be authorized, neither of them calls for an independent finding as to the scope of the criminal activity under investigation. Thus, unless the existence of an "operation" were an element of the offenses under investigation, these statutes do not appear to require probable cause to conclude that an "operation" exists.

The proposed additional probable cause requirement makes even less sense given that both statutes have been interpreted to permit the overhearing of "unknown" persons. *See State v. Thompson*, 191 Conn. 360, 375, 464 A.2d 799, 809 (1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 999, 79 L.Ed.2d 231 (1984); *Kahn*, 415 U.S. at 157, 94 S.Ct. at 985. It would therefore be illogical to require that probable cause be demonstrated as to the scope of the activity under investigation but not as to the identities of those involved. Defendants' argument would place the cart before the horse by predicating wiretap authorization upon a showing that the target activity assumes a scope different from that known by the applicant at the time of making the eavesdropping request. By so limiting wiretap investigations to a predetermined scope, the primary benefits of eavesdropping would be lost. *See* Carr, Section 4.4(c)(4) at 4–44.

It should be further noted that while the wiretap panel did not make a specific finding of probable cause as to the existence of an "operation," it did find probable cause that "others unknown" were committing the target offenses. *See* Gov't Exh. A, Order No. 87–15, para. B(1). This finding allowed the interception of communications by individuals whose precise identities were unknown at the time the wiretap order was sought. *See Kahn*, 415 U.S. at 157, 94 S.Ct. at 985. It follows, then, that this finding authorized such interception without pre-knowledge of the exact *number* of persons whose incriminating communications were subject to interception.

■ Even if the police were required to demonstrate probable cause to conclude that bugging defendant Onofrio's telephone would produce evidence of a professional gambling "operation," its affidavits would support such a showing. In them, Detective Grohe describes the following "reliable source information" he learned from the FBI criminal records check on Dominic Onofrio:

Dominic is the brother of convicted bookmaker Nicholas Onofrio of New Haven and Louis Onofrio of New Haven, who is currently operating an illegal gambling office in the New Haven area. [He] is currently a close associate of Salvatore "Butch" D'Aquila of Middletown, a convicted bookmaker *and who Onofrio is involved with in an illegal gambling business.* [H]istorically [he] was a close associate of Salvatore Annunziato, aka "Midge Renault," a documented Genovese Organized Crime Family member. Onofrio was employed in such capacities as personal driver, bodyguard, collector *and operated a bookmaking office under the direction of Annunziato.*

Gov't Exh. A, B, C, and D, Grohe affidavit, para 8(c)(1) (emphasis supplied). This information directly supports the government's suggestion in the wiretap applications that Onofrio was part of a broader gambling "operation."

Defendants correctly argue that this information fails to satisfy state requirements, modeled after the *Aguilar–Spinelli* test, as to information from an undisclosed scource. *See* Conn.Gen.Stat. Section 54–41c(13). Regarding the first requirement of that test, the affidavits contain some "facts establishing the existence and reliability of the informant." *Id. See* Gov't Exhs. A, B, C, D. Grohe Affidavit, para. 8(c)(1). However, the second requirement, that there be facts "stat[ing] the basis of the informant's knowledge or belief," Conn.Gen.Stat. Section 54–41c(13), is not met by the affidavits.

In reviewing a wiretap panel's finding of probable cause, the Connecticut courts have refused to engage in a rigid application of these requirements. "Lack of cir-

cumstances indicating an informant's basis of knowledge 'may be overcome by the presence of other factors such as corroboration of the information by the police, the existence of a declaration against penal interest, or reputation and past criminal behavior which could be a substantial basis for crediting hearsay...." *Ralston*, 7 Conn.App. at 672, 510 A.2d at 1352 (quoting *Ross*, 194 Conn. at 465–66, 481 A.2d 730). Other information may supply "a sufficient corroborating basis for the critical inference drawn by the wiretap panel, namely that the various informants' statements ... were reliable." *Id.* 7 Conn.App. at 676, 510 A.2d 1346.

In reviewing the issuance of wiretap Order No. 87–15, it is clear to this court that the panel had before it ample evidence to corroborate the FBI information tying defendant Onofrio to an ongoing and potentially expansive illegal gambling business *with* Salvatore "Butch" D'Aquila. Onofrio's participation in the numerous gambling-related calls intercepted over the narcotic wiretaps, *see* Gov't Exh. A, Grohe Affidavit, paras, 8(e), (f), (g), and (j), provided direct and substantial corroboration of that "source" information. Phillip Lombardo's conversation with an undercover officer, *see id.,* para. 8(h), further corroborated that information. Based on such corroborative evidence, Detective Grohe's experienced judgment, *see id.* para. 8(a), and the natural inference that bookmaking is seldom, if ever, conducted by solo practitioners, the wiretap panel was entitled to rely on the FBI information.

In sum, the defendants have not persuaded this court that the probable cause requirement that they have posited is either good law or is unsatisfied by the government's submissions to the wiretap panel. Therefore, probable cause is found to exist and all of the gambling wiretap orders are found to have been properly issued.[12]

## C. *Constitutionality of Gambling Wiretap Orders as Applied*

The defendants also claim that the gambling wiretap orders constituted "general warrants" in violation of the fourth amendment. They base this claim upon the provision within those orders permitting the interception of communications of "unknown persons" and the apparent absence of an authorized objective. According to the defendants, these two features rendered the orders unconstitutionally "overbroad," and thereby allowed the government to conduct a "fishing expedition."

■ It is well-established that the use of electronic surveillance is subject to the demands of the fourth amendment. *Berger v. New York*, 388 U.S. 41, 51, 87 S.Ct. 1873, 1879–80, 18 L.Ed.2d 1040 (1967); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Eavesdropping invariably involves a "broad" intrusion on privacy and must be "carefully circumscribed." *Id.* 388 U.S. at 56, 58, 87 S.Ct. at 1882, 1883. Accordingly, the need for "particularly describing the place to be searched, and the ... things to be seized" is viewed as "especially great in the case of eavesdropping." *Id.* at 56, 87 S.Ct. at 1882. Wiretap authorization that fails to meet this need, "[a]s with general warrants [ ] leaves too much to the discretion of the officer executing the order." *Id.* at 59, 87 S.Ct. at 1883.

■ With these standards as the backdrop, the defendants' argument is found to be strained and unsupported. As stated above, the wiretap orders in this case properly allowed the police to eavesdrop on the conversations of "unknown" individuals, where those communications were made over a target telephone, related to the target offenses and were intercepted in accordance with the other limitations of a properly issued wiretap order. *Kahn*, 415 U.S. at 157, 94 S.Ct. at 985; *United States v. Figueroa*, 757 F.2d 466, 470–71 (2d Cir.), *cert. denied*, 474 U.S. 840, 106 S.Ct. 122, 88 L.Ed.2d 100 (1985). *State v. Thompson*,

---

12. The probable cause challenge was specifically directed at wiretap Order no. 87–15. The interceptions obtained pursuant to that order

clearly demonstrated probable cause with respect to the subsequent wiretaps.

191 Conn. at 375, 464 A.2d 799. Furthermore, neither the government nor the wiretap panel was required to specify the objective of the electronic surveillance. *Carr*, section 4.4(h) at 4–82. The state, however, did identify the objective of the wiretap investigation in the wiretap applications as "[t]o uncover the complete scope of this illegal gambling operation." Gov't Exhs. A, B, C, and D, Applications Nos. 87–16, 87–18, 87–20, and 87–23, para. 7(d). The wiretap orders, which expressly incorporated the state's applications, *see id.* Orders Nos. 87–15, 87–17, 87–19, and 87–22, para B, clearly authorized that objective. *See Chiarizio*, 8 Conn. at 683, 514 A.2d 370 ("Just as an ordinary search warrant must not be read in a vacuum but must be evaluated together with its accompanying application and affidavit, [citation omitted] so must a wiretap order be evaluated together with its accompanying applications and affidavit.").

The defendants contend that such an objective, if, in fact, authorized by the wiretap orders, converted those orders into "general warrants." They present no facts, authorities, or argument, however, to support this contention. To the contrary, the numerous limitations explicitly found in the wiretap orders—e.g., as to the individuals, facilities, communications, offenses, hours, and duration subject to eavesdropping—directly contradict any notion that the orders operated as "general warrants."

D. *Use of Interceptions Relating to Unauthorized Offenses*

1. The Gambling Wiretaps

█ Defendants assert as another ground for suppression that the government used interceptions of the gambling wiretaps to obtain an indictment charging offenses that were not specified in the wiretap orders in violation of Title III. The wiretap orders authorized interception of wire communications relating to state gambling offenses, Conn.Gen.Stat. Sections 53–278b(b) and 53–278d(a), yet the offenses charged in the indictment are 18 U.S.C. Section 1955 (operation of illegal gambling business) and 18 U.S.C. 894 (extortion and conspiracy). Under Title III, before an investigative or law enforcement officer can disclose the contents of intercepted communications "relating to offenses *other than those specified* in the order of [wiretap] authorization or approval" in a criminal or grand jury proceeding, subsequent judicial approval must be obtained. 18 U.S.C. Section 2517(5) (emphasis added). Such approval can be granted where a judge of competent jurisdiction "finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions" of Title III. *Id.* Defendants concede that a disclosure order pursuant to section 2517(5) was obtained in the instant case, but argue that it was issued upon an insufficient showing by the government.

Section 2517(5) embodies "two conflicting principles." *United States v. Masciarelli*, 558 F.2d 1064, 1066 (2d Cir.1977). First, it is designed to "prevent evasion of the several restrictions [Title III places] upon original applications (e.g., showing of probable cause, enumerated serious crime, ineffectiveness of other investigatory techniques as to that offense)." *Marion*, 535 F.2d at 700–01. Otherwise the government could obtain wiretap authorization for one offense as a "pretext" for intercepting evidence of other offenses for which Title III's prerequisites could not be satisfied. *Masciarelli*, 558 F.2d at 1067; *Marion*, 535 F.2d at 701. On the other hand, "where a law enforcement officer lawfully engaged in a search for evidence of one crime inadvertently comes upon evidence of another crime the public interest militates against his being required to ignore what is in plain view." *Id.* (citations omitted). Therefore, section 2517(5) permits the use of interceptions relating to unauthorized offenses but only upon a judicial determination that the original wiretap application was sought in good faith.

Section 2517(5) is silent on its face as to the kind of showing that is required to obtain judicial approval. *See United States v. Gerena*, 653 F.Supp. 974, 978 (D.Conn.1987) (Section 2517(5) "does not

specify the exact form an application for subsequent approval should take, nor exactly what procedures a court should follow in giving or denying its authorization."). According to the statute's legislative history,

Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.

S.Rep. No. 1097, 90th Cong., 2d Sess. 12, *quoted in* 1968 U.S.Code Cong. & Admin. News, 2112, 2189; H.Rep. 488, 90th Cong., 1st Sess. 100. This language sets out only the substantive elements of a proper showing under section 2517(5). While an application "need not take any particular form," *Gerena*, 653 F.Supp. at 978, it is clear that some kind of factual submission describing the conversations in question is required. For example, the requirements of section 2517(5) have generally been found to be satisfied, whether or not an application was made specifically under that section, where the issuing authority "was made aware of 'material facts constituting or clearly relating to [the] other offenses....'" *United States v. Ardito*, 782 F.2d 358, 362 (2d Cir.), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 338 (1986) (quoting *Masciarelli*, 558 F.2d at 1067–68).

Whatever the precise standards are in determining the sufficiency of a section 2517(5) application,[13] the instant application is plainly lacking. It consists of merely a listing of the four state gambling wiretaps, the fact that interception of communications relating to unauthorized offenses occurred, and the conclusory statement that "[t]hese communications were intercepted incidentally and in good faith." Government's Supplemental Response to Defendants' Memoranda in Support of Motions to Suppress Fruits of Electronic Surveillance,

Exh. A. It is a "form" application, unaccompanied by a supporting affidavit or any exhibits and completely devoid of any details relating to the interceptions here challenged. Such a skeletal showing fails to provide the approving judge with any real opportunity to pass on the validity of the interception in question, as required by Section 2517(5). This is especially true where, as here, the government sought approval from a different issuing authority than the one which initially authorized the wiretap orders and, presumably, was familiar with the history and progress of the wiretap investigation. *Cf. United States v. Castellano*, 610 F.Supp. 1359, 1434 (S.D.N.Y. 1985).

■ Having found that a violation of section 2517(5) has occurred, the court now considers the propriety of ordering suppression of the wiretap evidence. Suppression is not the necessary or, even, the usual remedy for such a violation. *See* Carr, section 5.9 at 5–55 (noncompliance with section 2517(5) has only occassionally led to suppression). Determining whether this "drastic remedy" is appropriate in the instant circumstances "requires an examination of the purpose to be served by the Title III requirement which has been violated and a decision as to whether that purpose has been frustrated by the violation." *United States v. Aloi*, 449 F.Supp. 698, 721 (E.D.N.Y.1977) (citing *United States v. Donovan*, 429 U.S. 413, 433–40, 97 S.Ct. 658, 671–74, 50 L.Ed.2d 652 (1977)). The court undertakes this examination mindful that "[s]trict compliance with the requirements of section 2517(5) ... [is] essential." *Marion*, 535 F.2d at 706.

■ It is beyond dispute that the purpose of the section 2517(5) amendment requirement is "to insure that the original wiretap was obtained in good faith and not as a subterfuge." *Aloi*, 449 F.Supp. at 722. *See also Marion*, 535 F.2d at 701

---

**13.** Ordinarily, suppression challenges are directed at the untimeliness or complete lack of a section 2517(5) application not at the sufficiency of one. This court is aware of only one reported decision in which such a sufficiency challenge was raised. That decision, *United States v. Arnold*, rejected the challenge without discussing the standards against which such an application should be measured. 576 F.Supp. 304, 311 (N.D.Ill.1983), *aff'd* 733 F.2d 823 (7th Cir.1985).

("Without a judge's determination of inadvertence, Title III authorization might rapidly degenerate into what Justice Clark recently termed 'the electronic equivalent . . . of a "general search warrant." ' ") (quoting *United States v. Brodson*, 528 F.2d 214 (7th Cir.1975)). The question in the instant case thus becomes whether the wiretap authorization ostensibly directed at state gambling offenses was sought in good faith or as a pretext to gather evidence of other wrongdoing.

Defendants suggest that the wiretap investigation was conducted in bad faith. They argue that the federal authorities were interested in this investigation at the outset but allowed the state investigators to act as their surrogates, pursuing evidence of federal gambling offenses without specifically stating so in the wiretap applications. Defendants attach great significance to the fact that the apparent objective of the investigation was to uncover the existence of an "illegal gambling operation," which, they claim, would be material to the federal offense, 18 U.S.C. Section 1955, but not to the authorized gambling offenses.[14]

These arguments are unpersuasive. The only investigative activity of a federal nature that defendants have pointed to was in connection with an unrelated investigation into illegal narcotics dealing. In that investigation, a federal pen register was obtained which subsequently assisted the investigators in obtaining wiretap authorization. It was in the course of that wiretap that the government learned, inadvertently, that Dominic Onofrio was operating an illegal sports bookmaking operation of an undetermined scope. The state officials then set out to expose the entire operation in which defendant Onofrio was involved. Whether or not federal law enforcement officers took an interest in this matter, no one could have reasonably known at the time that the first gambling wiretap was sought that such eavesdropping would intercept conversations relating to 18 U.S.C. Section 1955 or 18 U.S.C. Section 894. To determine that such results were, in fact, the object of the wiretap operation would attribute to the law enforcement officers involved a prescience and cunning for which no showing whatsoever has been made.

The implication of defendants' argument that state-federal cooperation within a wiretap investigation may, by itself, reveal a violation of Section 2517(5) is a clear distortion of the statute. As the second circuit recognized in *Marion*, Title III specifically contemplated joint federal-state wiretap investigations and, therefore, requires a certain degree of flexibility in applying section 2517(5) under certain circumstances. 535 F.2d at 707.

> If, for example, federal officials called into an ongoing state wiretap operation learned at that time of communications relating to separate federal offenses not specified in the initial interception order, there would be little difficulty in obtaining the requisite subsequent approval pursuant to section 2517.

*Id.* That the subject of the state wiretap investigation actually involved criminal activity which because of its nature and magnitude constituted distinct federal offenses is not alone evidence of bad faith or subterfuge.

The instant facts clearly demonstrate that only the technical requirements of section 2517(5) and not its purposes were violated by the filing of a deficient application. The interceptions gathered over the wiretaps consisted of a wealth of relevant and material conversations relating to the state crimes named in the original wiretap authorization. This removes any doubt that the overheard conversations were the proper subject of interception and that the original wiretap orders were lawfully obtained. *See Masciarelli*, 558 F.2d at 1068. Because the interceptions were also probative

---

**14.** One of the elements of 18 U.S.C. Section 1955 is that the illegal gambling business "involve[ ] five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business." Neither of the state gambling offenses specified in the wiretap orders requires the involvement of more than one person. *See* Conn.Gen.Stat. Sections 53–278b(b) and 53–278d(a).

of distinct federal offenses, the government did obtain judicial approval prior to disclosing the intercepted communications in any federal proceedings. *Cf. Marion,* 535 F.2d 697 (court dismissed indictment where government failed to secure subsequent judicial approval at any time before the challenged interception was used in federal grand jury proceedings); *Brodson,* 528 F.2d 214 (dismissal upheld where government applied for an amendment under section 2517(5) eight months after grand jury indictment returned). The filing of a section 2517(5) application, though deficient, nonetheless invited judicial scrutiny of the use to which the government wished to put the wiretap evidence. It can hardly be said that a fuller factual showing by the government would have precluded the judicial approval it, in fact, received.

### 2. The Narcotics Wiretaps

■ Defendant Onofrio raises an additional challenge under section 2517(5) directed at the state's use of intercepted communications from the narcotics wiretaps. He claims that the government utilized certain intercepted communications collected over the narcotics wiretaps to obtain authorization to wiretap his telephone in connection with the unrelated investigation into professional gambling. According to Onofrio, such use was improper because the government failed to apply for a disclosure order, as required by section 2517(5), in a timely manner.

This argument is without merit and is quickly rejected. The text of section 2517(5) indicates that intercepted communications relating to unauthorized offenses may be used or disclosed in accordance with subsections (1) and (2) of that section without prior judicial authorization. Subsections (1) and (2) permit the disclosure of such interceptions to other investigative or

law enforcement officers and the use of such interceptions by the recipient officer "to the extent such use is appropriate to the proper performance of his official duties." By contrast, when disclosure is made pursuant to subsection (3)—i.e. in connection with "giving testimony under oath or affirmation in any criminal proceeding in any court of the United States or of any State ..."—prior judicial authorization is required by section 2517(5).

An *ex parte* application for a wiretap order has been held not to constitute a "proceeding" within the meaning of section 2517(3). *See, e.g., United States v. Vento,* 533 F.2d 838, 854 (3d Cir.1976). The legislative history of section 2517 supports this holding by revealing Congress' intention to limit the scope of subsection (3) to the use of wiretap evidence at trial. *See* 1968 U.S. Code Cong. & Admin.News at 2188–89. Subsection (2), on the other hand, "envisions use of the contents of intercepted communications, for example ... to establish probable cause to search." *Id.* at 2188. It follows, then, that an application for a wiretap authorization was a use equally intended to fall within the scope of subsection (2). *See Vento,* 533 F.2d at 855.

■ In light of this reading of section 2517, which defendant Onofrio has provided no reason to question, the state had no obligation to seek judicial approval to disclose the contents of the challenged interceptions within the application to tap Onofrio's telephone for gambling offenses. Therefore, it is unnecessary to determine whether the judicial approval that the state did obtain fell short in any way of the requirements of section 2517(5). Defendant Onofrio's related arguments challenging the state's failure to disclose information in their section 2517(5) applications also lack merit.[15]

---

**15.** For example, the failure to disclose within the motion to amend the wiretap applications Nos. 87–13 and 87–13–1A *nunc pro tunc* the fact that the state's application to extend the narcotics wiretap was initially denied by the wiretap panel did not violate Conn.Gen.Stat. Section 54–41c(8). That section requires certain disclosures "concerning all previous *applications* ... involving any of the same persons, facilities or places specified in the [new] application." (Emphasis added). *See State v. Assuntino,* 180 Conn. 345, 349–52, 429 A.2d 900 (1980). It was unnecessary under this section to make such a disclosure because the "previous applications"— i.e. those regarding the narcotics wiretaps— made no mention whatsoever of Dominic Onofrio.

### E. *Execution of Wiretap Orders*

 Another ground on which defendants seek suppression of the wiretap evidence is their argument that the investigators failed to minimize their electronic surveillance as required by the wiretap orders.[16] Ordinarily, a minimization challenge complains of "indiscriminate listening," which improperly included nonpertinent and privileged conversations. *See, e.g., Thompson,* 191 Conn. 360, 464 A.2d 799. By contrast, the defendants' challenge is directed at the failure to terminate interception when called for under the wiretap orders. Whether or not the argument is properly couched in terms of minimization, it fails for lack of merit.

The starting point of defendants' argument is the assumption that the "authorized objective" of the wiretap orders was to gather evidence of gambling offenses only to the extent that an unspecified number of individuals were implicated. According to the argument, once the state intercepted communications implicating "Mr. Onofrio and [several] others" on the third day of the execution of wiretap Order No. 87–15, the "authorized objective ha[d] been first obtained" and, pursuant to paragraph D of the order, the interception should have "automatically" terminated. The failure to terminate the interception at that time—in fact, state investigators continued for another nine days on that wiretap and for another 20 days on the three successive wiretaps—supposedly violated the express terms of the wiretap order.

The problems with the argument are manifold. First, it provides no basis for objectively determining at what point the authorized objective is "first obtained" and the termination provision is triggered. Wiretap Order No. 87–15 authorized interception of the communications of "Dominic Onofrio, Phillip Lombardo and other unknown persons." "Other unknown persons" could contemplate several individuals

or a number much larger than that. Defendants disregard the deliberate inexactness of that provision and seek to arbitrarily limit the scope of the authorized eavesdropping. Second, and more importantly, the argument completely ignores the fact that the true objective of the wiretap investigation, as implicitly authorized by the wiretap orders, was to reveal the full scope of the gambling operation. Such an objective is not met by interceptions revealing merely a few of the other members of a potentially expansive enterprise. Certainly if the termination provision was meant to have taken effect at such a time, then the wiretap panel which issued Order No. 87–15 would hardly have issued three successive orders authorizing continued surveillance. In short, this argument also fails to persuade the court that the wiretap evidence should be suppressed.

### F. *Post Interception Notice*

Notwithstanding any post-interception notice that may be required under either the federal or Connecticut wiretap statutes, the claims of lack of notice are not supported by sufficient facts. These claims are therefore rejected for a lack of showing.[17]

### G. *Defendant Onofrio's Remaining Claims*

#### 1. Staleness

 Defendant Onofrio attacks the narcotics wiretaps as having been improperly issued due to the state's noncompliance with the requirements of Conn.Gen.Stat. Section 54–41c(7). That section provides in pertinent part that "[n]o order authorizing or approving the interception of a wire communication shall be issued if the facts and circumstances relied upon by the applicant were discovered more than twenty days next preceding the date of the applica-

---

**16.** Both federal and state law require minimization. *See* 18 U.S.C. Section 2518(5) and Conn. Gen.Stat. Section 54–41c(9).

**17.** In addition, an evidentiary hearing was requested to determine the government's compliance with the "sealing" requirement. *See* 18

U.S.C. Section 2518(8)(a). In the absence of the lack of a sufficient showing, this request is also denied. *See United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir.1969), *cert. denied,* 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970).

tion." Conn.Gen.Stat. Section 54–41c(7). Onofrio contends that none of the information properly relied upon in application No. 87–13 was obtained within the applicable twenty day period.

The affidavit by Officer Schaeffer offered in support of application No. 87–13 describes, among other things, a controlled purchase of narcotics from one of the target individuals which took place within twenty days of the application date. *See* Schaeffer Affidavit, paras. S and T. Defendant Onofrio argues that this information does not satisfy section 54–41c(7) since it is "a compilation of similar information earlier obtained within the scope of the investigation." Onofrio Brief at 8. However, the very case he relies on, *State v. Ralston*, undermines this argument. In that case, the court found that while much of the information contained in the affidavit was acquired "long beyond the twenty day period" some additional information supporting the finding of probable cause was discovered within that period. *Ralston*, 7 Conn.App. at 681, 510 A.2d 1346. The court concluded that "at least where the application and affidavit indicate a continuing course of criminal activity, as they do here, the twenty day statutory rule is not violated if the finding of probable cause rests on facts and circumstances discovered within the period in addition to facts and circumstances discovered beyond the period." *Id.* at 681–82, 510 A.2d 1346.

This court agrees with that analysis, finds that it is applicable to the instant case, and, therefore, rejects Onofrio's argument as without merit.

### 2. Miscellaneous Claims

The court has reviewed the other claims raised by defendant Onofrio asserting violations of the wiretap orders and other infirmities. Substantially for the reasons set forth in the government's brief, and for lack of showing, either on the merits or in fact, the claims must be rejected.

## II. Search and Seizure Claims

Three defendants, Vincent Sapere, Charles Cerreta and John Wiernasz, challenge the validity of the search warrants under which their homes were searched and evidence of gambling offenses was seized. The warrants authorized a search of the premises and persons of the defendants for

[w]ritten wagers, records of wagers, records of monies owed, money, flash paper, soluble paper or other writing paper, cassette tapes, tape recorders, calculators, telephones, telephone conversations, pens, pencils, papers and books with names and/or telephone numbers, telephone toll records.

The issuing state judge found probable cause to believe that each of these defendants operated a sports bookmaking "office" out of the premises to be searched. He based probable cause on the affidavits [18] furnished by two SOCITF agents conducting the investigation. The affidavits contained some eighteen pages detailing the results of their ongoing investigation. The affiants had a combined total of 31 years on the State Police force, nearly eight of them with the SOCITF. The affidavits refer extensively to interceptions made during the course of the four gambling wiretaps, which directly implicated most of the defendants in a large-scale, illegal bookmaking operation. Defendants attack the sufficiency of those affidavits to establish probable cause.

Before considering the individual merits of the motions, the applicable standards for determining the sufficiency of warrant affidavits should be set forth. The law determining those standards is federal. *See United States v. McGriff*, 678 F.Supp. 1010, 1012 (E.D.N.Y.1988) (citing *United States v. Pforzheimer*, 826 F.2d 200, 202–04 (2d Cir.1987) (federal law applies to federal criminal prosecution even though underlying investigation was conducted solely by state officials)).

---

**18.** The state attached essentially the same affidavit to the three separate warrant applications. To avoid unnecessary detail or confusion, no effort is made to distinguish between the affidavits in this ruling. Citations to specific portions of the affidavits below simply refer to the "affidavit."

In *Illinois v. Gates,* the Supreme Court established the "totality of the circumstances" test to evaluate the showing of probable cause necessary to obtain a search warrant.

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing."

462 U.S. at 238–39, 103 S.Ct. at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). This test recognizes that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* 462 U.S. at 232, 103 S.Ct. at 2329.

■ A judicial finding that probable cause exists is entitled to "substantial deference" from the reviewing court. *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). In close cases, therefore, doubts should be resolved in favor of upholding the warrant. *Id. Accord Massachusetts v. Upton,* 466 U.S. 727, 734, 104 S.Ct. 2085, 2088–89, 80 L.Ed.2d 721 (1984) (citing *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) ("[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded warrants.")).

### A. *Vincent Sapere*

Vincent Sapere attacks the sufficiency of the affidavit on three grounds. He argues that it is deficient because it provided no basis to search for such items as water soluble paper described in the warrant nor to search for such items on his person. In addition, defendant Sapere claims that the information contained in the affidavit was stale. Each of these arguments lacks merit and does not require lengthy analysis.

■ The affidavit provides ample information to sustain a probable cause finding that Vincent Sapere was engaged in illegal gambling activity from the premises described in the warrant. During a period from late November to mid-December, 1987, the police intercepted four gambling-related phone calls which were "call forwarded" to a telephone located at those premises. Affidavit, paras. 16, 38, 42, and 44. Vincent Sapere was identified as having participated in one of those calls. *Id.* at para. 16. Emil Sapere, also named in the warrant, was identified in two of the other monitored conversations. *Id.* at paras. 42 and 44. Both individuals had prior arrests and convictions relating to illegal gambling. *Id.* at paras. 42 and 48. In fact, the telephone facility located at the same premises had been used in furtherance of a similar operation by Emil Sapere and others in 1980. *Id.* at para. 42. The investigators' suspicion was corroborated by physical surveillance of the premises in the weeks and days before the police sought the search warrant. *Id.* at para. 48.

The affidavit does not explicitly mention such items as water soluble paper or other gambling paraphernalia likely to be found at the premises in question or on the person of Vincent Sapere. It is equally silent as to *why* such items were likely to be found on his person. But only by reading the affidavit "in a hypertechnical, rather than a commonsense, manner," *see Gates,* 462 U.S. at 236, 103 S.Ct. at 2331 (quoting *Ventresca,* 380 U.S. at 109, 85 S.Ct. at 746) could it be considered insufficient for those reasons.[19] Lastly, movant's claim that the

---

**19.** One need merely glance at the numerous intercepted conversations described in the affidavit, including those involving Vincent and Emil Sapere, to recognize the obvious need for paper in the conduct of the sports bookmaking operation. Those conversations consisted almost entirely of the exchange of numbers, names and code words to communicate information relating to the betting "line," wages placed, and the amounts of money gained. It is

information contained in the affidavit was stale and, therefore, an improper basis for the warrant is unsupported by the facts of this case. *See United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985) (probable cause is generally unaffected by a time lag of five weeks where search warrant sought at the culmination of a major investigation into ongoing, long-term criminal activity).

B. *Charles Cerreta*

▮ Charles Cerreta contends that the affidavit fails to establish a sufficient nexus between his illegal gambling activity and his residence. In particular, he attacks the sufficiency of the following paragraphs of the affidavit, which are the most directly related to Cerreta's residence, to support such a nexus.

46. That on December 21, 1987, the last day of monitoring, no calls were monitored on facility 238–9468 [Gratta's "office" at 55 Main Street in Meriden] and neither Charles Cerreta's nor Francis Gratta's vehicles could be located. This indicated that this particular operation had moved.

47. That as William Sbona of Middletown has called a Meriden telephone number to reach Charles Cerreta in the furtherance of this gambling operation, the telephone toll records for facility 346–2320 were obtained for the period of December 26, 1987 to January 17, 1988. These tolls reflected that another Meriden number was being called, that being 235–8610, which is leased to Bernard Cerreta at 58 Home Avenue in Meriden. The records of the Telephone Company further showed that on January 19, 1988 and January 20, 1988, 235–8610 was "call forwarded" during prime wagering hours to 235–8634, which is located at the Cerreta residence at 145 Shelley Road in Meriden. (The Telephone Company records will not show if a telephone was "call forwarded" on previous dates.):

a. That a total of 50 calls were made from 346–2320 to 235–8610 during those dates. Each of these calls were made during those times when an illegal sports wagering operation would be conducted whether the calls were on a weekend in the afternoon for the day games or during the week in the evening for evening games.

b. These telephone toll calls, as based upon the affiant's previous experience and training, show that the illegal gambling operation of William Sbona, in Middletown, and Charles Cerreta, in Meriden, are continuing on a regular basis.

Taking this information together with the facts contained in the rest of the affidavit, it is clear that the affidavit does provide an adequate basis to conclude that evidence of gambling offenses would be found at the Cerreta residence. The affidavit amply documents Cerreta's deep involvement in the criminal enterprise, tying him to the operation of both a large-scale bookmaking office and "the top office in the operation" being run out of two separate locations on Main Street in Meriden. *See,* Affidavit, para. 14. The sudden inactivity at these locations in December, 1988 and the high volume of calls forwarded—a device frequently used in *this* bookmaking operation—to the Cerreta residence thereafter supports an inference that Cerreta had moved his operation to his home. That the affiants drew this inference further enhances its weight. *See Fama,* 758 F.2d at 838 (agent's expert opinion as to where criminals likely to keep evidence of their illegal activity is an important factor). Even without a specific nexus to the Cerreta residence, the natural inference one may draw that evidence of professional gambling is likely to be found in the homes of those engaged in it[20] may have alone supported the finding of probable cause. *See United States v. Anderson,* 851 F.2d 727,

clearly a reasonable inference to draw that people engaged in such a business keep written records and are likely to carry them on their persons.

20. The conduct of, at least, some of Cerreta's co-defendants supports such an inference. Dominic Onofrio, John Wiernasz and perhaps other cohorts, as the record shows, did operate their illegal bookmaking business from their home telephones.

729 (4th Cir.1988), *cert. denied,* —— U.S.
——, 109 S.Ct. 841, 102 L.Ed.2d 973 (1989).

### C. *John Wiernasz*

The only new argument raised by this motion is that the affidavit failed to establish how the movant's voice was identified on the gambling-related interceptions.[21] This claim, however, is flatly contradicted by paragraph 48 of the affidavit upon which the search warrant was issued. Looking at all of the pertinent information contained in the affidavit, this court concludes that the "pieces fit neatly together" to support the judge's determination of probable cause. *See Massachusetts v. Upton,* 466 U.S. at 733, 104 S.Ct. at 2088.

### Conclusion

For the foregoing reasons, all of the motions to suppress the electronic surveillance evidence are denied, and all of the motions to suppress tangible evidence are denied.

SO ORDERED.

---

**21.** Defendant Wiernasz also asserted "nexus" and "staleness" arguments essentially identical to those discussed above. Those arguments fail for the same reasons as those previously stated.